IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-cv-00245-RPM

TYNIA JOHNSON, a resident of Boulder County, Colorado and
PATRICIA SAINT CYR, a resident of Orleans Parrish, Louisiana,

Plaintiffs,

v.

BOULDER COUNTY, a Political Division of the State of Colorado, by and through its BOARD
OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER, COLORADO,
PAUL DANISH,
RONALD K. STEWART,
TOM MAYER,
JANA MENDEZ, and
DAVID WEBSTER,

Defendants.

---

## BOULDER COUNTY'S MOTION FOR SUMMARY JUDGMENT
---

Defendants Boulder County, Paul Danish, Ronald K. Stewart, Tom Mayer, Jana Mendez,

and David Webster (collectively "the County"), move for summary judgment against Plaintiffs

Tynia Johnson and Patricia Saint Cyr (together "the landowners") under F.R.C.P. 56(b).  In

support, the County states as follows:

### Procedural Background

On November 2, 2005, the Court dismissed all of the landowners claim claims other than

the 42 U.S.C. § 1985(3) claim.  On December 9, 2005, the County filed a motion to dismiss the

claims against the individual defendants under F.R.C.P. 45(c) based on the landowners' failure to

serve process on the individuals. The Court has not ruled on the County's 45(c) motion.  If any individuals are still parties, those defendants reserve the right to file further motions, including motions under F.R.C.P. 12(b) and 56(b).

**Statement of the Facts**

**I.      The landowners' acquisition of the Flagg Drive property and operation of an illegal kennel**

*A.       Purchase of the Property*

In late 1999, Ms. Johnson bought residential property at 12416 Flagg Drive in Boulder County (the "Property") because she wanted to operate a home-based kennel and dog grooming business. (Deposition of Tynia Johnson, Exhibit A, 30-32).  Prior to purchasing the property, she determined that the Property did not meet the County's setback requirements for a kennel. (*Id.*, 35:4-20, 37:9-16).  She was also aware that portions of the Property were in the 100-year floodplain. (*Id.*, 30:2-5).

Despite the potential problems with setbacks and flooding, Ms. Johnson applied for a residential mortgage on behalf of herself and her mother, Patricia Saint Cyr.  (Deposition of Patricia Saint Cyr, Exhibit B, 46-47).  To obtain a mortgage that she would not otherwise qualify for, Ms. Johnson falsified information on her mortgage application.  She stated her income was $9000 per month even though she was a welfare recipient earning $7,376 a year. (Mortgage Application, Exhibit C, at Bates no. 7439, Johnson Depo., Exhibit A, 14:24-25, and 1999 Tax Return Transcript, Exhibit D, p.1 at ln 33).  She also indicated that her mother's income was $9400 per month, when it was really $4,566 a year. (Mortgage Application, Exhibit C, at Bates no. 7450 and Saint Cyr Depo., Exhibit B, 49:7-17).  The landowners received a balloon loan with

a 10.092% interest rate and a $252,902 final payment due in November of 2004. (Federal Truth in Lending Statement, Exhibit E, Balloon Payment Disclosure, Exhibit F).

### B.    Illegal kennel operation

Although the Property did not meet County setback requirements for a kennel and did not have the required state license, Ms. Johnson immediately opened her kennel.  She received a cease and desist order from the State of Colorado on January 19, 2000, for operating an unlicensed kennel. (Colorado Dept. of Agriculture file, Exhibit G, at Bates nos. 3036-3038) In addition, a dog died in Ms. Johnson's care on May 29, 2000  (*Id.*, at Bates no. 3039).  On June 2, 2000, and again on July 25, 2000, Ms. Johnson received notice from Boulder County that her kennel operation was in violation of County zoning regulations. (Scheduling Order, Exhibit H, p. 6, ¶ 3, and July 25, 2000, letter to Ms. Johnson, Exhibit I).  In August of 2000, Ms. Johnson was fined and issued a Cease and Desist Order by the State for violations of state pet care law. (Dept. of Ag. file, Exhibit G, at Bates nos. 3041-3047).

On October 12, 2000, Boulder County adopted new land use regulations that softened the setback requirements for kennels. (Scheduling Order, Exhibit H, p. 7, ¶ 9).  Rather than requiring a 300-foot setback for all kennels, the new regulations allowed noise mitigation measures to be used instead, provided the use was approved by the County through the special review process. (*Id.*).

After the adoption of the new kennel regulations, Ms. Johnson continued to operate her kennel illegally and did not apply to the County for approval. (Scheduling Order, Exhibit H, p. 6, ¶ 4).  On December 11, 2000, the State of Colorado issued Ms. Johnson a warning because two aggressive pit bulls had escaped from their runs. (Dept. of Ag. file, Exhibit G, at Bates no. 3052).

The State of Colorado found multiple violations at the Property on May 3 and July 24, 2001. (*Id.*, at Bates nos. 3053, 3056).

On January 10, 2001, the County notified Ms. Johnson that she needed to file a special use application for her kennel within 30 days or a zoning enforcement action would be brought against her. (January 10, 2001 letter to Johnson, Exhibit J). Ms. Johnson failed to file the required application. (Johnson Depo., Exhibit A, 110:6-9). On July 30, 2001, the County served a summons and complaint on Ms. Johnson for her illegal kennel operation. (Return of Service, Exhibit K). She ultimately pled "no contest" to the enforcement action, agreed to pay a fine, and stipulated that she would not operate her kennel until she received County approval. (Scheduling Order, Exhibit H, p.6, ¶ 6-7). Ms. Johnson filed a special use application for a 100-animal kennel the day after she was served with the zoning enforcement summons. (*Id.*, p. 7, ¶ 8 and May 7, 2002 Staff Recommendation, Exhibit L, at 1).

## II.     Boulder County's Land Use Regulations

When Ms. Johnson filed her special use application, the County was required to apply the Boulder County Land Use Code ("BCLUC") regulations related to kennels in agricultural districts, special review, and floodplain development (*See* BCLUC, Exhibit M, §§ 4-102, 4-503, 4-600 through 4-605, 4-400 through 4-409).

### A.     *Special Review for kennels*

The Flagg Drive property is located in the Agricultural Zoning District of Boulder County. (May 7, 2002 Staff Recommendation, Exhibit L, 1). In the Agricultural district, a kennel is a permitted use, provided it complies with BCLUC § 4-503. (BCLUC § 4-102(B)(3)(a), Exhibit M). For kennels with 12 or more dogs or cats, "the animals shall be kept a minimum of

4

300 feet from any property line or other mitigating circumstance exists or may be created which has the same or better mitigating effect. [K]ennels of this size require special review." (*Id.*, §4-503(F)(5)(b)). Special review is a discretionary approval by the Board of County Commissioners of Boulder County. (*Id.*, § 4-600).

In a special review hearing, the commissioners consider such factors as whether the proposed use will be in harmony with the character of the neighborhood and compatible with the surrounding area; whether it will result in an over-intensive use of land; whether it will cause significant air, odor, water, or noise pollution; and whether it will be adequately landscaped, buffered, and screened. (BCLUC § 4-601(A), Exhibit M). If the commissioners choose to approve a special use application, they are entitled to impose conditions and safeguards to insure compliance with the special review criteria. (*Id.*, § 4-601(B)).

### B.    *Floodplain Development*

Portions of the Property fall within the floodplain overlay district. (BCLUC § 4-402(A)(8), Exhibit M and Plaintiffs' First Discovery Response ("1st Discovery Response"), Exhibit N, p.10 ¶ 8). In the floodplain overlay district, the level of permissible development depends on several factors, including whether the proposed development is in a floodway. The "floodway" is "those portions of the Floodplain Overlay District that must be kept free of development and other encroachments so the base flood is conveyed with no more than a one foot increase in the water surface elevations . . ." (BCLUC § 18-161, Exhibit M). The County prohibits development in floodways that cause a rise in the base flood elevation. (*Id.*, § 4-403(A)). The Boulder County Engineer, or his designee, is responsible for making floodway

5

determinations using "any base flood water surface elevation and floodway data available from state or federal agencies, or other reliable sources." (*Id.*, § 4-406(A)(1)).

If an applicant wishes to place development in a floodway, he or she is required to demonstrate the proposed development will not cause a rise in flood elevations. (BCLUC § 4-403(C), Exhibit M). To do so, the applicant must submit . . . "[a] floodway analysis by a Colorado Registered Professional Engineer using methodology acceptable to the Federal Emergency Management Agency . . ." (*Id.*, § 4-407(B)(2) and Rebuttal to Cave Report by John Ewy ("Ewy Rebuttal"), Exhibit O, ¶ 6.5). Alternatively, an applicant desiring to place development in a designated floodway may apply to the Federal Emergency Management Agency ("FEMA") for a formal Letter of Map Amendment ("LOMA"). (Ewy Rebuttal, Exhibit O, ¶ 6.5) A LOMA allows an applicant, free of charge, to request that FEMA determine that a particular development is on high ground and therefore would not cause a rise in the flood elevation. (*Id.* and 44 CFR § 70.3). If the County receives a LOMA for a particular development, the development is no longer subject to the County's floodplain management regulations. (Ewy Rebuttal, Exhibit O, ¶ 6.5).

## III.    Ms. Johnson's Special Use Application and Conditional Approval

Mr. Webster is the County staff person designated by the County Engineer to administer the County's floodplain management regulations. (Affidavit of David Webster, Exhibit P, ¶ 1, and see BCLUC § 4-406(A)(1), Exhibit M). On October 10, 2001, Mr. Webster identified the Property on the applicable FIRM map and discovered that portions of the Property were in a floodplain. (Deposition of David Webster, Exhibit Q, 27:8-14, 76-77). Ms. Johnson's special review application indicated that the proposed "Building 8" and buffer fence would in the

6

floodway. (October 11, 2001, Memorandum, Exhibit R)  Based on these and other floodplain

concerns, Mr. Webster recommended denial of the special use application. (*Id.*).

On May 7, 2002, Boulder County Commissioners Ronald K. Stewart, Jana Mendez, and

Paul Danish held a public hearing on Ms. Johnson's special review application for a kennel.

(Transcript of May 7, 2002, hearing, Exhibit S, p.1).  Ms. Johnson was represented by her

attorney, Ed Byrne. (*Id.*, 316-317).  Regarding the floodway issue, Mr. Byrne stated:

> I'm gonna just run through this flood stuff; . . .  It is difficult for
> my client to find the resources to provide that data up front, but if
> it were to be the single condition that would stand between her and
> an approval, it could then be justified and it could be financed.

(*Id.*, 318-323).  Curtis Kostecki, an engineer, testified that "an extensive [floodway] model

would probably show that [Ms. Johnson is] out of the floodway." (*Id.*, 809-810).

In response to Mr. Kostecki's testimony, Mr. Webster testified: "I wouldn't be surprised

if maybe a re-analysis of this floodway information might come out showing that the floodway is

actually pulled back and we have . . . a much narrower width . . . ." (Transcript of May 7, 2002,

hearing, Exhibit S, 1090-1093).  He further testified:

> [A]s much as I'd like to believe that maybe the floodway is
> different within this particular reach . . . we [need] to actually re-
> analyze this particular reach, using acceptable methods.  . . . [T]his
> application is no different than any other that we've required for
> this type of process for development in a floodway . . .

(*Id.*, 1133-1140).

In response to the floodplain/floodway testimony presented at the hearing,

Commissioners Stewart and Mendez initially proposed tabling the hearing for a month so that

Ms. Johnson could provide a floodway study. (Transcript of May 7, 2002, hearing, Exhibit S,

1634-1647).  Ms. Johnson objected to that long of a delay, and, as a result, the Board agreed to continue the hearing to the following week. (*Id.*, 1969-1979).

At the continued hearing on May 14, 2002, county staff submitted a report outlining Ms. Johnson's options concerning the floodway, which were: "1. Construct the fence in areas outside the floodway . . . ;  2. Hire an engineer to have a floodway re-analysis prepared that meets all of the requirements of Article 4-407(B)(7);  3.  Submit a site survey and any other necessary information to FEMA as part of a . . . LOMA." (May 14, 2002, Staff Recommendation, Exhibit T, p.2).  Ms. Johnson's attorney did not express any objection to these options.  In fact, he stated that he had "[s]poken with FEMA.  They will entertain a FOMA [sic] application, which is a map—not a map amendment, but a clarification . . " (Transcript of May 14, 2002, hearing, Exhibit U, 40-41).  Mr. Webster agreed that a LOMA was a viable option: "[FEMA] may very well decide, based on the site survey, that the majority of the property is in fact outside of the special flood hazard area . . ." (*Id.*, 287-288).

The Board conditionally approved Ms. Johnson's application to operate a kennel. (Resolution No. 2002-51, Exhibit V, p.2).  One of the conditions was that "[t]he fencing shall not be placed in the floodway, and shall be subject to all applicable floodplain regulations of the Boulder County Land Use Code." (*Id.* a p.3 ¶ 3).

**IV.    Post-hearing events**

Rather than submitting a new fencing plan or hiring an engineer to conduct a floodway re-analysis, Ms. Johnson instead submitted a LOMA application to FEMA. (September 5, 2002 FEMA letter, Exhibit W).  After reviewing the application, FEMA sent Ms. Johnson a letter indicating that it needed additional information. (September 18, 2002 FEMA letter, Exhibit X).

8

Three months later, FEMA closed Ms. Johnson's file because she failed to supply the requested information. (FEMA document dated December 24, 2002, Exhibit Y).

Meanwhile, Ms. Johnson continued to operate the kennel illegally. On April 26, 2002, the State of Colorado cited Ms. Johnson for operating her kennel without a current state license. (Dept. of Ag. file, Exhibit G, Bates nos. 3059-3060). She was issued a citation for failure to separate aggressive animals following an incident that occurred in September, 2003. (*Id.*, Bates no. 3063). A month later, a second dog died in Ms. Johnson's care and its body was discovered in a trash dumpster by State inspectors. (*Id.*, Bates no. 3065). Based on these and other events, Ms. Johnson was issued a cease and desist order from the State, which prohibited her from operating a kennel on the Property. (*Id.*, Bates no. 3068). Later, the State obtained an injunction prohibiting Ms. Johnson from operating a kennel anywhere in the State of Colorado. (Scheduling Order, Exhibit H, p. 8 ¶ 15).

## Argument

**Landowners have no material evidence of a conspiracy to violate their civil rights.**

The County Defendants are entitled to summary judgment in their favor under F.R.C.P. 56(b) and (c). A party opposing summary judgment must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-52 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994). A party opposing summary judgment cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

9

To succeed with a 42 U.S.C. § 1985(3) conspiracy claim, landowners must prove (1) the existence of a conspiracy, (2) intended to deny plaintiffs equal protection under the laws or equal privileges and immunities of the laws, (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).  As demonstrated below, the landowners have no material evidence to prove the elements of a conspiracy.

        A.      *The landowners have no evidence of a conspiracy.*

To establish a civil conspiracy, the landowners must establish that two or more persons acted in concert.  *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir. 1990). A plaintiff's failure to produce evidence establishing a genuine issue of material fact regarding a meeting of the minds or agreement among the defendants warrants summary judgment in the defendants' favor. *Id.*

The landowners have been unable to identify any communication among the Boulder County officials and/or employees that established or furthered a conspiracy. When asked "Were there any meetings between members of the conspiracy to decide to take a certain course of action?" Ms. Johnson answered "Am I aware of any?  I'm not, actually." (Johnson Depo., Exhibit A, 196:4-13).  She admitted she had no knowledge of any meetings between Mr. Webster and any individual county commissioner (*Id.*, 193-94) or any other meetings between the commissioners and County staff. (*Id.*, at 194). She also admitted that she didn't know if the Board of County Commissioners was involved in the alleged conspiracy or if it was even aware of it. (*Id.*, 200:7-15).  In fact, when asked "Who conspired with whom?" Ms. Johnson answered: "I don't know who conspired with whom." (*Id.*, 196:19-20).  Because the landowners have no

10

evidence that any defendant "conspired," summary judgment should be entered against the landowners for failure to establish a conspiracy.

> B. *Landowners have no material evidence that the County defendants intended to deny landowners equal protection under the laws or equal privileges and immunities of the laws.*

Even if the landowners had evidence of a meeting of the minds, they cannot prove intent to deprive them of equal protection or privileges and immunities of the laws. *See Murray,* 45 F.3d at 1422. "The language of § 1985(3) requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (emphasis in original). To prove animus, a plaintiff must present evidence that "the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993). The landowners cannot produce any material evidence that the County's decided Ms. Johnson's special use application based on a desire to discriminate against African Americans.

The landowners have no direct evidence of racially motivated conduct. They admit that no Boulder County officials or staff, including David Webster, made a derogatory comment to the landowners regarding their race. (1st Discovery Response, Exhibit N, p. 11 ¶¶ 15, 16). The landowners have offered several possible motivations for the County's actions other than race discrimination. For example, in their original Complaint, the landowners alleged that the County defendants were discriminating against Ms. Johnson based on her disability. (Verified Complaint and Demand for Jury Trial, ¶ 67). Ms. Johnson has also claimed that the motivation behind the

County's decision was the County's alleged desire to buy her property for open space. (Johnson Depo., Exhibit A,  219-220).

Furthermore, the landowners have no evidence that anyone associated with the County even knew Ms. Saint Cyr was African-American, let alone made decisions because of her race. Ms. Saint Cyr acknowledged that she never had contact with anyone associated with Boulder County during the relevant timeframe. (Saint Cyr Depo., Exhibit B, 12-13).  She admitted that she had never met David Webster or any of other named defendants in this case. (*Id.*, 13:3-12). When asked "Is it your belief that David Webster discriminated against you because of your race?" Ms. Saint Cyr responded by asking "Who is David Webster again?" (*Id.*, 54:13-15).

Not only have landowners failed to produce any direct evidence of invidious, class-based discrimination, they cannot identify any action by the County Defendants from which discrimination could be implied.  The landowners' theory is that the County Defendants conspired to prevent the landowners from operating a kennel by requiring that they comply with County flood management regulations prior to commencing their operations.  The landowners' theory of race discrimination makes no sense.  The proposed 100-animal kennel was not a use by right, but rather a use subject to discretionary approval by the County. (*See* BCLUC, Exhibit M, §§ 4-503(F)(5)(b), 4-600).  The land use staff had recommended denial on several grounds other than the flood hazard issue. (May 17, 2002 Staff Recommendation, Exhibit L, Bates nos. 1108-1113).  If the county commissioners were motivated by invidious class-based bias to prevent landowner's proposed use, they could have denied the application on a variety of grounds.  The Board's conditional *approval* is evidence the County was acting in good faith with proper motives.

The landowners may argue that the conditional approval was a clever plan to prevent the use without actually denying it. However, as pointed out in subsection (A) above, the landowners have no evidence of a meeting among County officials or staff to conceive a plan.  More importantly, the County's conditional approval gave the landowners an option that would allow landowners to operate their kennel *without further review by the County*.  Mr. Webster made this clear in the staff recommendation to the Board:

> [A] site survey . . . indicates that [Ms. Johnson's] land may be above the 100-year water surface elevation.  If . . . the applicant received a LOMA from FEMA . . . it would allow building a new fence *and a floodplain development permit would not be necessary.*

(May 14, 2002 Staff Recommendation, Exhibit T, p. 2) (emphasis added).  If the County were trying to stifle the landowners' opportunities, it would not have allowed review by a third-party, such as FEMA, to clear the way for the landowners' proposal.

The option of obtaining a LOMA was not an unreasonable hardship placed on the landowners.  "A LOMA application is processed through FEMA and is mostly an administrative process.  Preparation of a LOMA by a registered engineer or surveyor would generally cost $2000 to $3000. . . .  There is no application fee . . ." (Summary Report for Hallman House Kennel, Exhibit Z, at Bates no. 7123).  In fact, Ms. Johnson's failure to obtain a LOMA was not a result of any difficulty inherent in the process, but rather a result of her own inaction. She filed a LOMA application, but failed to follow-through after FEMA requested additional information. (September 5, 2002 FEMA letter, Exhibit W; September 18, 2002 FEMA letter, Exhibit X; FEMA document dated December 24, 2002, Exhibit Y).  A start-up cost of two to three thousand dollars—or even a start-up cost three times that amount—is minimal.

The landowners may also claim that racism must have been the motivation behind the County's decision by arguing that the concern about a fence in the floodway was trivial and should have been ignored.  However, the County's land use code is very explicit:

4-403 **Floodway**

> A.  No development, encroachment, use, or alteration in, on or over any part of the floodway shall be permitted which alone or cumulatively with other such uses would cause or result in:   . . .
>
> 5.  the potential of solid debris (including, but not limited to garages, storage sheds, decks, fences, etc.) or waste (including, but not limited to septic systems, etc.) being carried downstream; or
>
> 6.  an encroachment that would adversely effect the efficiency of the floodway or change the direction of flow or cause any increase in the base flood elevation.

(BCLUC § 4-403, Exhibit M).  This type of limitation is mandated by FEMA, which requires communities to "prohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway . . ." 44 C.F.R. § 60.3(d)(3).  Ms. Johnson admits that FEMA representatives told her that Mr. Webster "had every right to do what he did . . ." (Johnson Depo., Exhibit A, 121:6-9).

Strict floodway development regulations are important because they protect the health and safety of the County's citizens.  A six-foot high solid wood fence within a floodway

> would have a significant and profound impact to the floodplain hydraulics and could cause adverse impacts to adjacent property owners.  Impacts could include diversion of floodwaters by blocking the flow path, an increase in water surface elevations due to damming or accumulation of debris, or an increase in channel erosion due to increased velocities and concentrating flow paths.

14

(Ewy Rebuttal, Exhibit O, p. 6, para. 4).  During the hearing on Ms. Johnson's special use

application, Commissioner Danish expressed the concern more directly by stating:

> we're dealing with a floodway, not a floodplain.  A floodway is
> written not just for the safety of the applicant, it's written for the
> safety of the people downstream, because as damage occurs and
> debris are added to the burden of the flood, they create real life
> safety issues . . . it's for good reason that we object to development
> in the floodway. . . . Sometimes . . . you get a wall of water that
> goes downstream and that can kill people.

(Transcript of May 7, 2002, hearing, Exhibit S, 1441-1449).

The landowners also argue that the County's decision was racially motivated by alleging

that other property owners have received permits for development in the floodway. (Scheduling

Order, Exhibit H at 4).  However, the landowners admit that "they have no way of being certain

of the race . . . of each of the permit holders . . ." (1st Discovery Response, Exhibit N, p.6 ¶ 5).

Furthermore, the landowners have no evidence that these other property owners were similarly

situated.  For example, plaintiffs' counsel asked Mr. Webster why the County issued a floodplain

development permit for a County-built bridge upstream of the Property, and Mr. Webster

responded:

> Q. What was the criteria for giving the county different treatment
> than others?
>  . . .
>
> A.   No other treatment was given to the county.
>
> Q. Why were they permitted to build a structure in the floodway,
> do you know?
>
> A.  The structure is specifically designed to not be an
> encroachment during times of flooding.  And it cost the county
> quite a bit more to construct that type of structure versus a
> conventional bridge.

(Webster Depo., Exhibit Q, 125-126).  The County's enforcement of its floodplain development criteria even on its own projects is further proof the County did not discriminate when it enforced its requirements against the landowners.

As demonstrated above, the County's decisions were based on legitimate health and safety concerns that are reflected in specific County and federal regulations.  The landowners had a fair and meaningful opportunity to pursue development under the conditions imposed by the County to protect it citizens, but Ms. Johnson simply dropped the ball by not pursuing her LOMA application.  The landowners cannot establish a genuine issue of material fact that the County Defendants' actions were motivated by an invidious intent to discriminate against African-Americans.  Thus, summary judgment should be granted in favor of the County Defendants.

> C. *Landowners have no competent evidence that the alleged conspiracy was the proximate cause of their injuries.*

To establish a conspiracy under § 1985(3), a plaintiff must prove that the conspiracy resulted in an injury or deprivation of a federally-protected right. *Murray*, 45 F.3d at 1422. Because § 1985, like § 1983, is a constitutional tort or quasi-tort action, proximate cause is an essential element of the claim. *See Daniels v. Gilbreath*, 668 F.2d 477, 481 (10th Cir. 1982). Therefore, the landowners must present competent evidence that their injuries, namely loss of the property to foreclosure and/or inability to operate a kennel, were caused by the alleged conspiracy of the County Defendants.  As shown below, the landowners cannot meet this burden.

16

1.    The foreclosure on the landowners' Property was caused by their fraudulent application for a mortgage they could not afford.

In 1999, Ms. Johnson applied for a residential mortgage on behalf of herself and Ms. Saint Cyr.  (Saint Cyr Depo., Exhibit B,  46-47).  At that time, Ms. Johnson yearly income was $7,376 and Ms. Saint Cyr's was $4,566. (1999 Tax Return Transcript, Exhibit D, p.1 ln 33 and Saint Cyr Depo., Exhibit B, 49:7-11).  However, in the mortgage application, Ms. Johnson stated that her income was $9,000 per month and Ms. Saint Cyr's income was $9,400 per month. (Mortgage Application, Exhibit C, Bates nos. 7439, 7450 and Saint Cyr Depo., Exhibit B, 49:7-11).  Ms. Johnson also indicated on the application that Ms. Saint Cyr's home address was in Boulder even though she had never lived there. (Mortgage Application Exhibit C, Bates no. 7449 and Saint Cyr Depo., Exhibit B, 7:15-16).  Ms. Johnson claimed that her mother was self-employed by a business called "Saint Cyr Consulting Services," but Ms. Saint Cyr admitted that she had "no idea" what that business was and had never operated a business by that name. (Mortgage Application, Exhibit C, Bates no. 7449 and Saint Cyr Depo., Exhibit B, 49:1-6).

Ms. Johnson also signed a notarized affidavit that stated that Ms. Saint Cyr would occupy the property by October 29, 1999. (Occupancy Affidavit, Exhibit AA and Saint Cyr Depo., Exhibit B, 44-45).  The document went on to state that "[w]e are aware of and understand that if we fail to move in to the property by the specified time that we are subject to prosecution . . . and that we are liable to be fined not more than $5,000, or imprisoned not more than two years or both." (*Id.*)  However, Ms. Saint Cyr never lived at the Property nor did she intend to live there. (Saint Cyr Depo., Exhibit B, 50-51, 7:7-16).  When asked about this apparent violation of the law, Ms. Saint Cyr stated: "I guess I go to jail now, huh?" (*Id.*, 45:10-13).

17

Although Ms. Saint Cyr was included on the mortgage application because she "had better credit" (Johnson Depo., Exhibit A, 43:22-25), Ms. Saint Cyr did not believe she had any responsibility for making mortgage payments.  Before purchasing the property, Ms. Johnson and Ms. Saint Cyr agreed that Ms. Johnson would have sole responsibility for making the payments. (Saint Cyr Depo., Exhibit B, 18:7-19).  Ms. Saint Cyr did not feel she had any responsibility for making payments if Ms. Johnson failed to make them. (*Id.*, 20:17-20).

As demonstrated above, the proximate cause of the landowners' inability to make their mortgage payments resulted from Ms. Johnson's fraudulent—and possibly criminal—conduct in obtaining the loan in the first place.  The landowners should not be rewarded for Ms. Johnson's misdeeds by being allowed to continue with the lawsuit.

2.    Ms. Johnson's inability to operate her kennel was caused by her own neglect.

Despite the County's approval of the kennel, the landowners claim they were injured by their inability to operate it.  However, the alleged injury was not due to any action by the County, but rather Ms. Johnson's neglect in failing to follow-through with her LOMA application and her failure to operate in kennel in accordance with State law.

"As with any application of this nature[,] the burden of proof falls on the applicant to demonstrate, using sound engineering practices, that the proposed development would bear no adverse impact on the floodplain and floodway." (Ewy Rebuttal, Exhibit O, at 6).  Ms. Johnson had the option of either hiring a Registered Professional Engineer to provide a floodway analysis, or she could have bypassed this requirement through the LOMA process. (*Id.* at  4). Because of this, Mr. Webster urged Ms. Johnson on many occasions to prepare her LOMA submittal to FEMA. (Webster Depo., Exhibit Q, 142-43).  Nonetheless, Ms. Johnson failed to

follow through on her application.  A FEMA representative sent Ms. Johnson a letter requesting only a small amount of additional material, such as building locations and elevations. (*See* September 18, 2002 FEMA letter, Exhibit X at 1).  Ms. Johnson never responded to this request. (FEMA document, Exhibit Y and Ewy Rebuttal, Exhibit O at 4).  This demonstrates that Ms. Johnson's inability to operate her kennel was caused by Ms. Johnson's dilatory behavior, not the County's conditional approval.

Ironically, even if the County had unconditionally approved Ms. Johnson's kennel, she would not have been able to operate it.  On October 20, 2003, Ms. Johnson was issued a cease a desist order from the State of Colorado based on multiple violations of the Pet Animal Care Facilities Act. (Dept. of Ag. file, Exhibit G, Bates no. 3068).  The Order arose out of an incident in which Ms. Johnson allowed a dog in her custody to be attacked and killed by another dog, after which Ms. Johnson disposed of the dog in a dumpster. (*Id.*, at Bates nos. 3063, 3065).

Subsequently, the Commissioner of Agriculture sought a permanent injunction against Ms. Johnson (Scheduling Order, Exhibit H, p. 8 ¶ 16).  In his Complaint, the commissioner noted "from 2000 through . . . November 13, 2003, the Commissioner has issued at least four Cease and Desist Orders against [Ms. Johnson]" that "arose from a long series of administrative enforcement actions related to the care of dogs by Defendant Johnson's pet animal facility." (Complaint for Injunctive and Other Relief, Exhibit BB,  ¶¶ 8-9).  The Commissioner succeeded in the action, and, as a result, Ms. Johnson is prohibited from operating a pet care facility in the State of Colorado. (Scheduling Order, Exhibit H, p. 8 ¶ 16).  This demonstrates that Ms. Johnson's inability to comply with state law, and not the County's special use determination, was the cause of Ms. Johnson's inability to operate her kennel business.

19

As demonstrated above, Ms. Johnson engaged in a series of negligent, fraudulent, and illegal acts that were the proximate cause of the loss of the Property and the business.  As a result, Ms. Johnson cannot present material evidence demonstrating that she suffered an injury as a result of the alleged conspiracy, and summary judgment should be entered in the County's favor.

### Conclusion

For the reasons stated above, summary judgment should be entered in favor of the County Defendants on Ms. Johnson and Ms. Saint Cyr's § 1985(3) conspiracy claim.

Respectfully submitted on this 13th day of March, 2006.


BOULDER COUNTY ATTORNEY


By: s/ David Hughes_____
David Hughes
Deputy County Attorney
Andrew R. Macdonald
Assistant County Attorney

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2006, I electronically filed the foregoing **BOULDER COUNTY'S MOTION FOR SUMMARY JUDGMENT** via the U.S. District Court electronic filing service, who will either serve the same via e-mail or United States mail to the following:

John W. McKendree
LAW OFFICES OF JOHN MCKENDREE
1244 Grant Street
Denver, CO  80203

s/ Kathy G. Nelson_____
Kathy G. Nelson
