1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 04-CV-0245-RPM-BNB

DEPOSITION OF TYNIA JOHNSON
EXAMINATION DATE:  September 13, 2005



TYNIA JOHNSON, a resident of Boulder County, Colorado, and PATRICIA SAINT CYR, a resident of Orleans Parrish (sic), Louisiana,

Plaintiffs,

v.

BOULDER COUNTY, a Political Division of the State of Colorado, by and through its BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER, COLORADO, PAUL DANISH,
RONALD K. STEWART,
TOM MAYER,
JANA MENDEZ, and
DAVID WEBSTER,

Defendants.

PURSUANT TO NOTICE, the deposition of TYNIA JOHNSON was taken at 9:10 a.m. on September 13, 2005, at 1325 Pearl Street, 5th Floor, Boulder, Colorado 80306, before Gene Van Der Volgen, Court Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.

Gene Van Der Volgen
Court Reporter

A P P E A R A N C E S

For the Plaintiffs:

JOHN W. McKENDREE, ESQ.

Law Offices of John McKendree

1244 Grant Street

Denver, Colorado 80203

303-861-8906

For the Defendants:

DAVID HUGHES, ESQ.

Boulder County Attorney's Office

1325 Pearl Street, 5th Floor

Boulder, Colorado  80306

303-441-3190

Also present:  Jackie Hamilton

PROCEEDINGS

(Jackie Hamilton was not present in the deposition room.)

TYNIA JOHNSON

The deponent herein, being first duly sworn to testify to the truth in the above cause, was examined and testified on her oath as follows:

EXAMINATION

BY MR. HUGHES:

Q    Could you state your name, please.

A    Tynia Johnson. T, like Tom, y-n-i-a.

Q    Ms. Johnson, have you ever had your deposition taken before?

A    I have not.

Q    You were present at the deposition of Mr. Webster that Mr. McKendree took, though; is that correct?

A    Yes.

Q    So you're somewhat familiar with how the process works?

A    Yes.

Q    One thing I wanted to mention that sort of helps the deposition go more smoothly is try to answer my questions out loud so the court reporter can get it down on paper, since this is a written transcript deposition. Can you do that?

A    Yes, I can.

Q    And if you could let me finish the question I ask before you answer it, so that it's easier for the court reporter to record the question and answer. Could you do that, please?

A    Yes.

Q    And if you don't understand or hear a question that I've asked, just let me know, and I can either repeat the question or rephrase it to try to make it more clear.

A    Thank you. That would be good.

Q    Now, you do understand that, even though we're in the sort of informal atmosphere of a conference room in the county courthouse, that this is a deposition under oath, and it's the same as if you were sitting in a courtroom before a judge? Is that -- do you understand that?

A    Yes.

Q    Okay.

How is your health today?

A    Good.

Q    Are you taking any medications or other substances that may affect your ability to participate in this deposition?

A    No.

MR. McKENDREE:  Could we go off the record for a moment?

MR. HUGHES:  Sure.

(A discussion was held off the record.)

Q    (By Mr. Hughes)  I understand you suffer from fibromyalgia?

A    I do.

Q    What are the symptoms of that?

A    My symptoms are pain. Sometimes I have trouble with memory. I can't hold things, the fingers don't really work.

Q    And I noticed you've brought a helper dog to the deposition today?

A    I do -- I did.

Q    What's the dog's name?

A    Appy.

Q    Happy?

A    Appy.

Q    Appy.

A    Short for Apple.

Q    Ah, and what does -- what does Appy do for you?

A    She carries things for me, helps me get around.

Q    Okay.

How long can Appy make it before Appy needs a break?

A    I guess if we pushed it, 12 hours.

Q    Oh, gosh. Well, we're not going to push it for 12 hours today.

You indicated you have issues with memory loss. Can you talk about those?

A    Can you be more specific?

Q    Well, what type of things are things that you tend to forget?

A    It doesn't -- there's no specific thing.

Q    Has your memory loss ever caused you to file a lawsuit that perhaps didn't have a basis?

A    No.

Q    Do you suffer from any other medical conditions?

A    No.

Q    Do you think your fibromyalgia will affect your ability to have your deposition taken today?

A    No.

Q    If there is an issue in which your memory is not good, will you let me know if I ask you a question about that?

A    Yes.

7 (Pages 7 to 10)

11

Q    Have you ever told anyone else, besides me, that you suffer from memory loss as a result of fibromyalgia?

A    Yes.

Q    Who?

A    Almost everybody I come into contact with. It's not a secret.

Q    Did you file a lawsuit related to the property that you owned on Arapahoe in Boulder County?

A    Yes.

Q    What was that lawsuit about?

A    Gas tanks under the property.

Q    And what happened in that lawsuit?

A    It was dismissed.

Q    And why was it dismissed?

A    Because there was no basis, I think, was the reason.

Q    And did your memory loss come into play in that lawsuit?

A    I'm not sure. It was a timing thing.

Q    Did you ever tell your attorney in that lawsuit that your memory loss as a result of fibromyalgia was what caused you to forget that the seller had revealed that the property had previously been used as a gas station?

12

A    Um -- yes. I think I did tell them that.

Q    And if, in fact, the property -- if, in fact, you knew that the property had been used as a gas station, there wouldn't have been a basis for the lawsuit; is that correct?

A    Yes.

Q    This deposition's going to last a little while, so if we get to any point where you feel you need a break, please let me know. It's not an endurance test, okay?

A    Uh-huh.

(Jackie Hamilton entered the deposition room.)

MR. HUGHES: Just let the record reflect that Jackie Hamilton, who is my paralegal, is going to be joining us for portions of the deposition, as well.

Q    (By Mr. Hughes) What did you do to prepare for today's deposition?

A    Nothing. Oh, well, let's see. I spoke with a paralegal in Mr. McKendree's office.

Q    When did you do that?

A    Last week.

Q    Did you review any documents?

A    I didn't.

Q    Did you meet with anybody else besides the

13

paralegal from Mr. McKendree's office?

A    I did not.

Q    What is your current address?

A    We don't actually have an address. We have a post office box, because we live on a vacant lot in a travel trailer.

Q    Where is the vacant lot?

A    In Boulder County on Flagg Drive --

Q    Um --

A    -- next door to the property we used to own.

Q    And so you get your mail at a post office box?

A    Yes.

Q    What is the post office box address?

MR. McKENDREE: Is that a yes, ma'am? Please answer yes or no. Don't use some other word.

THE DEPONENT: Oh. I thought I said yes.

MR. HUGHES: You said, Yeah, to --

MR. McKENDREE: I heard yeah, so pardon me while I jump all over my client.

A    I'm sorry.

Q    (By Mr. Hughes) What is the address of the post office box?

A    Post Office Box 366, Lafayette, Colorado 80026.

14

Q    Do you have a business address?

A    No.

Q    What's your educational background?

A    Have a degree from CU in economics.

Q    And when did you get that degree?

A    In '98.

Q    And I understand you had a stint in the military?

A    I did.

Q    How long were you in the military?

A    About three years.

Q    What were your assignments there?

A    After basic training and advanced individual training, which is where you learn your job, for the most part, I was stationed in Fort Bragg, and I was assigned to a unit that did, let's see, propaganda development.

Q    Huh.

And when were you discharged from the military?

A    December of '90, 1990.

Q    What kind of discharge was it?

A    General.

Q    I understand you receive disability payments?

A    I do.

8 (Pages 11 to 14)

Stormo Reporting, Inc.  (303) 200-4792

27

1st of August, because we wanted to go through and make sure we had everything correct, and because Boulder County served us with a -- I think -- I think it was a lawsuit -- I can't remember what it was, but it was some kind of a service -- we went on and submitted it early.

Q    So to the best of your recollection, did you submit it on July 31st, 2001?

A    Yes.

Q    At the bottom of the document, there's a stamp that says "BCLU 1143." Do you see that?

A    Yes.

Q    That's -- I'm just going to reference that for purposes of the page numbers of this document.
        Could you turn to the page that has the stamp BCLU 1146. On page 1146 and 1147, it looks like a document entitled Narrative Hallman House Kennel. Do you see that?

A    Yes.

Q    Who wrote this document?

A    I did.

Q    And on page BCLU 1147, at the bottom, is that your signature?

A    Yes.

Q    Okay.
        And did you believe the information that you

28

submitted in this narrative to be accurate at the time you submitted it?

A    Yes.

Q    You purchased the property at -- 12416 Flagg Drive property with your mother?

A    Yes.

Q    Is that correct?
        When was that purchased?

A    October 27th, 1999, I believe.

Q    And what was the purchase price for that property?

A    $325,000.

        (Deposition Exhibit 29 was marked.)

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 29. Do you recognize that document?

A    Yes.

Q    What is that?

A    It's the warranty deed for the property on Flagg Drive.

Q    Did you visit that property before you purchased it?

A    Yes.

Q    What was it being used for at that time?

A    Residential property.

Q    Somebody was living there?

29

A    Yes.

Q    To the best of your knowledge, had the Flagg Drive property ever been used as a kennel, prior to your purchase of it?

A    To the best of my knowledge, no.

Q    Prior to your purchase of the property, did you have any information that indicated there could be flood concerns in the area?

A    I'm sorry. Can you restate that?

Q    Yes. Prior to your purchase of the property, did you have any information indicating there could be flood concerns in the area?

A    I don't understand the question.

Q    What information did you have with respect to any flood concerns in the area of the Flagg Drive property, prior to your purchase?

A    I didn't have any concerns.

Q    Did you have any information indicating that there were -- there was a hundred-year floodplain on the property?

A    Yes.

Q    What information was that?

A    The Coal Creek and -- I can't remember the name of the other creek -- but it's a map that's generated by, I think, the Department of Agriculture or

30

Corps of Engineers. I can't remember who makes it.

Q    So prior to your purchase of the property, you understood that at least a portion of the property was in the hundred-year floodplain?

A    Yes.

Q    And prior to your purchase of the property, did you understand that at least a portion of the property was in the 500-year floodplain?

A    Yes.

Q    Did you purchase any flood insurance with respect to that property?

A    No.

Q    Why not?

A    It wasn't required.

Q    It wasn't required by whom?

A    By the mortgage company, and wasn't recommended by the title insurance company.

Q    Now, as I understand it, Coal Creek runs through a portion of the property?

A    Yes.

Q    And did you observe Coal Creek running through a portion of the property, prior to you purchasing it?

A    Yes.

Q    Prior to your purchase of the property, did

12 (Pages 27 to 30)

31

you ever consult with anyone in Boulder County government about whether a kennel could be operated on the site?

A    I -- my agent did.

Q    Who was your agent?

A    Ann Cooper.

Q    And what did she tell you with respect to her consultations with Boulder County government?

A    We received a fax from the County to that effect.

(Deposition Exhibit 30 was marked.)

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 30. Is that the fax that you were referring to?

A    Yes.

Q    There's a "c" at the bottom of the document that indicates Ann Cooper. That was your agent at the time?

A    Yes.

Q    Okay.

Now, what in this document indicated to you that a kennel was permitted on the property?

A    The sentence, "The Flagg Drive area is in an Agricultural Zoning District."

Q    And why was that significant to you?

32

A    Because we, at that time, had a grooming business on Arapahoe, which was also in Boulder County, and due to a dog barking case, which we won, the judge said, You didn't bring me a zoning case, you brought me a dog barking case. So I knew that the next phase of the -- what I call harassment -- but encounters with the County would be a series of letters that I was in zoning violation, which subsequently began to arrive.

So we started looking for a property that was zoned agricultural that we could then run our grooming operation out of. And we needed a property that was zoned agricultural, because we couldn't get anybody at the County to understand. We didn't actually run a large kennel operation; we boarded one or two dogs here and there, but we primarily groomed dogs at the Arapahoe property.

So we had to find an agricultural property to then move our grooming shop onto. So that's why that was important that that was zoned agricultural, because, at the time, the regulations with Boulder County said that in order to operate a kennel you had to be an agricultural and it was a by right, so that was pretty much the only information I understood we needed.

Q    Do you know whether Ms. Cooper informed -- let me ask you a preliminary question first. It looks

33

like that, Exhibit 30, was signed by somebody named Denise Grimm; is that correct?

A    Yes.

Q    And do you believe that it was Ann Cooper that contacted Denise Grimm with respect to this letter?

A    To the best of my knowledge, it is.

Q    Do you know whether Ms. Cooper informed Ms. Grimm that the property, or portions of the property, was in a hundred-year floodplain?

A    I don't have any idea.

Q    Do you know whether Ms. Cooper asked Ms. Grimm about whether there were setback requirements with respect to the property?

A    I don't know.

(Deposition Exhibit 31 was marked.)

Q    (By Mr. Hughes) I'm handing you another document, which is marked Exhibit 31. Do you recognize that document?

A    I don't.

Q    Okay.

It looks like the base document is similar to Exhibit 30; is that correct?

A    Correct.

Q    And there's some handwriting on that document?

34

A    Yes.

Q    Do you know whose handwriting that is?

A    I don't.

Q    So Ann Cooper was your real estate agent that was representing you in the transaction to purchase the Flagg Drive property?

A    Yes.

Q    Prior to your purchase of the property, what, if any, efforts did you make to determine where the setback lines were on the property?

A    We took a measuring device out and measured.

Q    Who's we?

A    Myself and my handyman.

Q    What's your handyman's name?

A    Michael Hodge (phonetic).

Q    Does he live in the area?

MR. McKENDREE: Currently or then?

Q    (By Mr. Hughes) Does he currently live in the area?

MR. McKENDREE: Thank you.

A    I believe he does still live in Colorado, but he's not -- he used to be in Boulder, but he's not there anymore.

Q    (By Mr. Hughes) Do you know what his current address is?

13  (Pages 31 to 34)

35

A    I don't.
Q    Do you know what his current phone number is?
A    I don't.
Q    What did you determine with respect to the setbacks?
A    That on the southern side of the property, we didn't have a 300-foot setback, and on -- get the directions going -- okay. So to the southern and eastern borders, we didn't have the 300-foot setback.
Q    What is the significance of a 300-foot setback?
A    My understanding of the setback was as a buffer for sound mitigation.
Q    So was it your understanding, at the time you went and measured the setbacks, that you needed a 300-foot setback for purposes of operating a kennel?
A    That was my understanding at the time.
Q    And that was prior to your purchase of the property?
A    Yes.
Q    Prior to your purchase of the property, did you consult or did your agent consult with anyone other than Ms. Grimm at Boulder County?
A    Um -- can you rephrase that question?
Q    I'd be happy to.

36

A    Okay.
Q    Prior to your purchase of the property, did you or your agent consult with anyone except for -- anyone in addition to Ms. Grimm at Boulder County?
A    Yes.
Q    Who else?
A    I don't have names, but I'm sure there were people in the -- whatever department's required for prepurchase and purchase transactions.
Q    You're talking about the clerk and recorders office, possibly?
A    Yes.
Q    Did you ever consult with anyone in the Land Use Department, in addition to Ms. Grimm?
A    Yes.
Q    Who else?
A    It was a planner. I don't know what their name was, and it was by phone.
Q    Okay.
    You had a conversation, personally?
A    I did.
Q    Do you remember what the date of that conversation was?
A    It was approximately July, toward the end of July, of '99.

37

Q    And what was that conversation about?
A    About the regulations for a kennel.
Q    And what did that planner tell you?
A    That the -- well, they told me what the list of regulations were and that they were in the process of re- -- reviewing and redoing them.
Q    Reviewing and redoing the kennel regulations?
A    Yes.
Q    So what was your understanding of the kennel regulations at the time you contacted that person at the Land Use Department?
A    That it was a by right and agricultural and that you needed a 300 set -- 300-foot setback, and there were some stipulations, as to parking, but I don't remember precisely, because parking wasn't particularly an issue.
Q    Did you have any discussion about the fact that the property was in the 100-year floodplain?
A    No.
Q    Did you talk to anybody at the Boulder County Transportation Department prior to your purchase of the property?
A    No.
Q    Have you told me everything that you can remember about the contacts you had with representatives

38

of Boulder County government, prior to your purchase of the property?
A    No.
Q    What else do you know about that? What else can you tell me about that?
A    In that period, probably between about May and July -- no. Let's see. Probably May to September, I had periodic inquiries about the zoning requirements for a kennel 'cause prior to that year, 1999 -- sorry -- I hadn't really operated much of a kennel, so I didn't -- I wasn't all that familiar with the kennel regulations, so I was trying to learn as much as I could about them in my search for a new location for the business.
Q    So --
A    So I had a couple of other conversations with -- as we looked at various properties, I would make inquiries about that property or the regulations themselves, so I would know whether that property would fit.
Q    Were any of those inquiries related to the Flagg Drive property?
A    I would say that I made at least two specific inquiries about Flagg Drive, during that period.
Q    Are those inquiries in addition to the

14  (Pages 35 to 38)

43

Q    And there's actually two uniform residential loan applications there, aren't there?
A    Yes.
Q    And what two applications are those?
A    One for me, and one for my mother.
Q    And your mother's name is Patricia Miller Saint Cyr?
A    Yes.
Q    Did I pronounce that correctly?
A    Yes, you did.
Q    You look surprised.
A    I'm impressed. It's impressive.
MR. McKENDREE: Late of New Orleans fame.
MR. HUGHES: Yeah, I understand that.
Q    (By Mr. Hughes) And this uniform residential loan application -- or both of these uniform residential loan applications were filled out for the purpose of obtaining a mortgage for 12416 Flagg Drive; is that correct?
A    Yes.
Q    Okay.
And why is that both you and your mother filled out loan applications rather than just you filling out an application?
A    She had better credit than I did.

44

Q    Did she -- was she going to have any responsibility for operating the kennel or the dog grooming operation?
A    No.
Q    So the kennel and the dog grooming operation was solely your responsibility?
A    Yes.
Q    Okay.
With respect to Ms. Saint Cyr's application, on the -- page 2 -- it indicates that her net rental income is approximately $3,000 a month; is that correct?
A    Yes.
Q    And was that your understanding of what her rental income was at the time of the application?
A    Yes.
Q    What -- where did that income come from?
A    The rental properties listed below.
Q    Okay.
So Ms. Saint Cyr owned a number of rental properties and received rent payments from those rental properties?
A    Yes.
Q    Okay.
And farther down on that page, there's a section entitled Assets, and under Assets, there's a

45

portion that indicates "Real estate owned." Do you see that portion?
A    Oh, yes.
Q    Okay.
And if I'm reading this correctly, it indicates that Ms. Saint Cyr, at the time of the application, owned approximately $1,080,000 worth of real estate; is that correct?
A    Yes.
Q    So was Ms. Saint Cyr also responsible for making the mortgage payments on this property?
A    No. Which property?
Q    On the Flagg Drive property.
A    No.
Q    You were the only person responsible for making the mortgage payments?
A    She was -- let's see. I was responsible to pay her an agreed on lease amount, and then she made the payments, so . . .
Q    How did you arrive at the agreed upon lease amount?
A    We determined it based on the amount of the mortgage payments.
Q    And was that an oral agreement with Ms. Saint Cyr, between you and Ms. Saint Cyr?

46

A    Oral and a written. There, I'm sure, was a lease.
Q    There's a written lease between you and Ms. Saint Cyr?
A    I believe so.
Q    Do you have -- are you aware whether you have a copy of that lease?
A    Under -- if you don't have it, then it probably is with everything else floating.
Q    Floating meaning in the aftermath of Hurricane Katrina?
A    Correct.
Q    So as I understand it, the arrangement you had was that you were to pay a lease payment to Ms. Saint Cyr, and she was responsible for making the subsequent mortgage payment?
A    Yes. Or else I could make it directly. I mean, being that we were related, we kind of sort of trusted each other.
Q    At the bottom of page 3, there's a signature. To the best of your knowledge, is that your mother's signature?
A    Yes.
Q    And there's another signature a third of the way down page 4. To the best of your knowledge, is that

16 (Pages 43 to 46)

47

your mother's signature?

A   Yes.

Q   Okay.

I'd like you to turn to page 6, please, and we're still on Exhibit No. 32. Is that the uniform residential loan application that you filled out?

A   Yes, sir, it is.

Q   And at the time you filled out that application, you indicated that you were self-employed at the Hallman House on 6303 Arapahoe; is that correct?

A   Yes.

Q   And you indicated you had been four years on the job; is that correct?

A   Yes.

Q   So does that mean, as of October of 1999, you had been operating the Hallman House Kennel on Arapahoe for -- or the Hallman House business on Arapahoe for approximately four years?

A   No.

Q   What does that mean?

A   It means I was working under the Hallman House name for four years.

Q   Okay.

So you were operating the Hallman House business at some location other than 6303 Arapahoe,

48

prior to this?

A   It was actually called Hallman Enterprises, not Hallman House Kennel.

Q   Okay. Hallman House. We'll just call it Hallman House. Yeah.

A   Okay. But it was Hallman Enterprises on the record.

Q   Okay.

A   Slightly different, and I had a business license with the State for Hallman Enterprises, and then subsequently changed it to Hallman House and got another business license to reflect the name change.

Q   Okay.

So what did this, four years on the job, what was that supposed to reflect?

MR. McKENDREE: You're talking about from the exhibit, correct, sir?

MR. HUGHES: From Exhibit 32, next to the provision related to years on the job at Hallman House.

MR. McKENDREE: Thank you, sir.

A   I'm sorry. Can you repeat the question, please?

Q   (By Mr. Hughes) Yes.

A   Okay.

Q   On Exhibit 32, page 6, there is a portion of

49

the application that indicates that you were self-employed at Hallman House, and next to that, there's a box that says years on the job, and underneath, it says "4." What did you intend to convey when you filled out "4" in that box?

A   That under the name Hallman Enterprises or House, I've been employed for four years.

Q   And what were you doing for that four-year period of time? What kind of employment was it?

A   For the beginning two years or so, it was sales.

Q   What kind of sales?

A   Nutritional products. And then -- and we did -- and we started doing dog-related items, and then subsequently phased out the other.

Q   Okay.

And you started doing -- when did you start doing the dog-related items?

A   Approximately '96.

Q   1996?

A   Yes.

Q   I'd like you to turn to page 7 of Exhibit 32. There's a portion of the form, on the top of the page, that has a box for base employment income. Do you see that box?

50

A   Yes.

Q   And next to that is indicated $8,000.

A   Hmmm.

Q   Do you see that?

A   Yes. I thought that was a 3.

MR. McKENDREE: Man, you almost need a magnifying glass --

THE DEPONENT: I know.

MR. McKENDREE: -- for this exhibit.

Q   (By Mr. Hughes) So at the time you filled out this application, you indicated that your income was $8,000 a month?

A   Huh. Apparently.

Q   Apparently?

A   I am rather surprised. Like I said, I thought that was a 3, so -- which would have -- I thought it was a 3, so I'm surprised that it's an 8.

Q   Well, you thought it was a 3 in this box right next to base employment income, instead of an 8?

A   Yes, I did.

Q   Okay.

And there's also an 8,000, two columns over, next to total; is that correct?

A   Okay. Well, that one looks like a 5, but -- I'm sorry -- it's really tiny and the eyeballs are kind

17 (Pages 47 to 50)

107

A    Hankard, yes. Hankard did generate a report suggesting how to mitigate for the 300 feet.

Q    Do you remember when you first contacted Hankard?

A    No, I don't remember.

Q    Okay.

(Deposition Exhibit 46 was marked.)

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 46. Do you recognize that document?

A    Yes.

Q    What is it?

A    It's a letter from Hankard Environmental to me, regarding the noise from Hallman House Dog Kennel.

Q    Does this letter refresh your recollection in terms of the approximate time you contacted Hankard to do their study?

A    The beginning of January of 2002.

Q    Did you conduct any other environmental reports, or reports on sound, related to the property?

A    Other than through Hankard?

Q    Right.

A    No. Everything that was done regarding sound came from Hankard.

Q    Were you satisfied with the result of Hankard's study?

108

A    Yes.

Q    Do you recall any errors in that study?

A    No. I don't recall any. Of course, I am not a sound engineer, so if there was one . . .

Q    Well, neither am I, so you don't have to worry.

A    Good.

MR. McKENDREE: So stipulated.

Q    (By Mr. Hughes) The second bullet point on page 46, could you read that to yourself?

MR. McKENDREE: You mean Exhibit 46.

A    Okay.

Q    (By Mr. Hughes) I'm sorry. Second bullet point on Exhibit 46.

A    Okay.

Q    Could you read that to yourself and -- for a moment.

A    Okay.

Q    Do you agree with Hankard's conclusions, as reflected in the second bullet point on page -- on Exhibit 46, related to the setbacks on your property?

A    Yes.

Q    Do you recall when Boulder County adopted new kennel regulations?

A    I know that they did, but I don't remember

109

the date that it was adopted.

Q    Okay.

(Deposition Exhibit 47 was marked.)

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 47. You probably haven't seen this document before. I don't know. But this document is a resolution signed by the Board of County Commissioners related to the adoption of some kennel regulations.

And then if you would look at the bottom of the page -- of the first page of Exhibit 47 -- it indicates that the Board of County Commissioners held a hearing on October 12th, 2000, related to those regulations. Does that sound about the right date, in terms --

A    Well, that was the date I referred to in the letter, so I knew that that date was when the hearings were, but I don't know when --

Q    Okay.

A    -- things went into actual meaning.

Q    Okay.

Looking at page 3 of that document, does it look like that was signed by the Board of County Commissioners on November 14, 2000?

A    Yes.

Q    Okay.

110

So it was approximately that time frame that the new kennel regulations were adopted, to the best of your recollection?

A    To the best of my knowledge, yes.

Q    Okay.

Now, how long was it between the time the new regulations were adopted and the time you filed your application to operate a kennel on the property?

A    Nine months, approximately.

(Deposition Exhibit 48 was marked.)

A    Maybe I'm wrong. Excuse me while I count. I don't know. I'm mathematically challenged at the moment. Yeah. About nine months. I was right the first time.

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 48. Do you recognize that document?

A    Yes, I do.

Q    What is that?

A    That's a -- hum, I guess it's not. It's a letter from Pat Mayne to me from the Office of the County Attorney. And the reference line says "Notice of Violations on Property..." basically located at Flagg Drive.

Q    And do you recall receiving this letter on or about January 10th, 2001?

32 (Pages 107 to 110)

Page 119

Q    Okay.
     But it is something that you sent to FEMA?
A    Yes.
Q    Did you get any written response to this application from FEMA?
     MR. McKENDREE:  Objection.
A    I did.  I got a letter.
Q    (By Mr. Hughes)  Do you recall when you got that letter?
A    It was probably within 30 days or so of submitting.
Q    And do you remember what that letter stated?
A    It actually requested more stuff, and I gave that to the surveyor.
Q    You gave the letter to the surveyor?
A    Yes.
Q    Okay.
     And do you know what the surveyor did with the letter?
A    I would assume he kept it in my file.  I don't know what he did with it.
Q    Do you know if the surveyor submitted additional material to FEMA?
A    I don't remember, because about that time we were notified that they couldn't do a map, a LOMA,

Page 120

because their map didn't show the floodway that we were trying to LOMA.  So I don't know whether -- I don't know whether he sent more information, because it was about the same time that we found out that there was nothing FEMA could do.
Q    When you're talking about "we" finding out, who is we?
A    Me and the surveyor.
Q    Okay.
     And how did you find out that information?
A    I can't remember whether it was by letter or by phone, but we got that -- I got that, actually, from FEMA.
Q    Okay.
     So you're not sure whether there's a letter from FEMA indicating they couldn't provide you with what you were requesting?
A    Correct.  I spent a lot of time on the phone with FEMA, so . . .
Q    Do you know who you talked to at FEMA?
A    I don't.  I didn't have a name.
Q    Did you talk to the same person every time or different people?
A    Um -- it was different people.
Q    Do you know whether it was the Washington,

Page 121

D.C. office of FEMA or the local branch?
A    Both.  I went to the local branch and talked to them on the phone, and the other FEMA office, that I would assume is in Washington, I was on the phone with quite a bit.
Q    Did anybody at FEMA tell you that Mr. Webster had done something illegal?
A    No.  Actually, they said he had every right to do what he did -- the first time.
     (Deposition Exhibit 53 was marked.)
Q    (By Mr. Hughes)  I'm handing you what's been marked as Exhibit 53.  Do you recognize that document?
A    Yes.
Q    What is it?
A    That's a letter to me from Ed Meacham, the zoning enforcement inspector at the Land Use Department, referencing the kennel at Flagg Drive.
Q    And do you recall receiving this letter on or about September 4th, 2002?
A    Yes.  I think I got it on my birthday, September 5th, therefore, it stood out in my brain.
Q    Probably not the present you were hoping for, huh?
A    Definitely not.
Q    Do you remember when the Flagg Drive property

Page 122

was sold at foreclosure?
A    2004, but I can't remember what month.  Probably summerish.
Q    Do you remember if you occupied the property for some time after it was sold at foreclosure?
A    I didn't occupy it at any point after it was sold in foreclosure.
Q    Do you remember whether an entry and detainer action was filed against you with respect to your occupation of the Flagg Drive property?
A    A what?
Q    An entry and detainer action.
A    Sorry.  I don't know what that is.
Q    Do you remember whether a lawsuit asking you to vacate the property was filed against you?
A    Hmmm.  I believe so.  We got some kind of papers to say --
Q    Do you remember --
A    -- I don't rightly remember what they were.
Q    -- do you remember when that was?
A    March, April.
Q    Of 2004?
A    You know, I honestly can't remember whether it was '3 or '4.
Q    Whether it was 2003 or 2004?  Okay.

191

that conditional approval work.

Q    What did the Board of County Commissioners do to lead you on?

A    They gave me a conditional approval.

Q    Is there anything else that they did?

A    Well, I think that was plenty.

Q    Is there anything else that they did?

A    Well, when I asked them about the bridge, specifically, that I wanted more information about it, and they just sort of threw that request in the trash. I thought that was pretty bad on their part.

Q    You think that the Boulder County commissioners wantonly violated the civil rights of its residents by not paying attention to your request for more information about a bridge?

A    You know, I don't really know the law, so I don't know whether that was a civil rights violation or just bad manners, but that's my answer.

Q    Is there anything else, besides the conditional approval by the Board of County Commissioners, that you believe wantonly violated the civil and constitutional rights of its residents?

A    Not at this time.

Q    What is it that Mr. Webster did to wantonly violate the civil rights of Boulder County residents?

192

A    When he created that floodway, that, for me -- because it took years, actually. And I still don't know -- if you walk across the street there and look at the map -- if his little penciled-in floodway is on the map that anybody else can walk in there and see, so, you know, I felt real special having my own personal autographed map and all, but I thought it was pretty bad that he didn't do that for everybody else after he did it for me.

Q    By saying that you felt special, are you being sarcastic?

A    Oh, yeah. I'm being very much so.

Q    Okay. Sarcasm doesn't really come across very well in the record, so --

A    I know. I appreciate you for catching that, though.

MR. McKENDREE:  I caught it and was about ready to chew you out. Answer the question factually.

Q    (By Mr. Hughes) So what is it -- so is it your testimony that Mr. Webster's creation of the floodway map was a wanton violation of the civil rights of Boulder County residents?

A    Yes.

Q    Anything else that Mr. Webster did?

A    Not that I can think of at this time.

193

Q    Okay.

What is it that Mr. Oxenfeld did to wantonly violate the civil rights of Boulder County residents?

A    Nothing that I can think of.

Q    What is it that Mr. Meacham did to wantonly violate the civil rights of its residents?

A    His biweekly drive-bys on the Flagg Drive property.

Q    Mr. Meacham driving his Boulder County vehicle by the Flagg Drive property twice a week?

A    Yes.

Q    Anything else?

A    That's all I can think of. Well, maybe his level -- I mean maybe his letters.

Q    Okay.

Anything else?

A    Nothing else at this time.

Q    Do you know whether Dave Webster met individually with the -- any of the members of the Board of County Commissioners, other than in the public hearings, related to the application that you filed?

A    Don't have firsthand knowledge of that.

Q    Do you have any knowledge of that?

A    At one of the hearings, the commissioners, I believe, said that they wanted to have further dialogue

194

or information from him. Whether or not that actually happened, I don't know.

Q    They wanted to have -- the commissioner said he wanted to have further dialogue or information outside of the hearing process?

A    Yes.

Q    Do you know whether any such meeting took place?

A    I don't.

Q    Are you aware of any -- do you have any other information related to meetings that took place between the Boulder County commissioners and Mr. Webster?

A    I don't.

Q    Do you have any information about meetings that took place between the Boulder County commissioners and Mr. Meacham?

A    I don't.

Q    Do you have any information about meetings that took place between the Boulder County commissioners and Mr. Oxenfeld, other than the testimony Mr. Oxenfeld gave at the hearings related to the kennel application that you filed?

A    I don't.

MR. HUGHES:  Let's take a break.

(A recess was taken at 3:41 p.m. until

53 (Pages 191 to 194)

195

3:47 p.m.)

Q (By Mr. Hughes) Ms. Johnson, do you know whether the Board of County Commissioners knew whether Mr. -- knew about Mr. Meacham -- do you know whether the Board of County Commissioners knew about the letter that Mr. Meacham sent on August 3rd, 2000, to you, which we've identified as Exhibit 56?

A I don't.

Q Do you know whether the Board of County Commissioners knew about the July 25th, 2000 letter that was sent to you by Mr. Meacham, which we've identified as Exhibit 55?

A I don't.

Q Do you know whether the Board of County Commissioners knew about the -- what we've referred to as the dog barking case, People versus Johnson?

A I'm sorry. Can you repeat that?

Q Do you know whether the Board of County Commissioners knew about the -- what we've referred to as the dog barking case, People versus Johnson?

A I don't.

Q In your Amended Complaint, you indicated that there was a conspiracy to deprive the plaintiffs of their civil rights. Can you explain how this conspiracy arose?

196

A How it arose or how it played out?

Q How it arose.

A I don't necessarily understand the question.

Q Well, were there any meetings that took place between the members of the conspiracy to decide to take a certain course of action?

A Am I aware of any? I'm not, actually.

Q Okay.

And who was involved in this conspiracy?

A I'm not sure I understand that question either.

Q Well, in your Amended Complaint, you indicate that there was a conspiracy to deprive the plaintiffs of their civil rights. What is your understanding of the word "conspiracy"?

A Oh, people conspiring to do or not do something.

Q Okay.

Who conspired with whom?

A I don't know who conspired with whom.

Q Well, what evidence do you have to support -- to support your allegation that there was a conspiracy?

A Well, if you look at the -- Exhibit 49, the Boulder County Transportation Department had my packet, but when they sent the summary of referral responses,

197

made no mention of a floodway, and, you know, I mean, I didn't get notification that this was an issue and how it impacted me until, like, January, or so, of 2002. So something had to transpire or somebody had to conspire for the Department of Transportation to suddenly, now, want to call this a floodway.

Q Well, what is it -- what is your understanding or what facts or evidence that you have -- do you have to support that something happened, other than Exhibit 49?

MR. McKENDREE: Object to the form of the question.

A What evidence? Well, building permits for starters.

Q (By Mr. Hughes) Which building permits?

A All the building permits on Flagg Drive that are in a supposed floodway that have been issued since 1976, when this data became available. Apparently, there was somebody in Dave Webster's job back in the '70s and '80s and '90s until he was hired. I can only assume he or she was white, or they. However many of them there were.

I know for a fact that many of the people who came to Boulder County with their requests for building permits were white. Interestingly enough, nobody pulled

198

out those maps or that information to say, Hmmm, this is a floodway, and you can't build there.

Q So you believe this conspiracy began in 1976?

A If that was the first time somebody came in for a building permit.

Q Is that a yes?

A Yes.

Q Okay.

So what happened in 1976 that constituted a conspiracy to deprive you of your civil rights?

A The issuance of building permits to white people.

Q Okay.

So the fact that building permits were issued to white people in 1976 constitutes a conspiracy to deprive you of your civil rights?

A No. What made that a conspiracy was that, in 1999 or 2001, I couldn't get a building permit.

Q Do you know of any other black individuals who were denied the opportunity to get a permit?

A I don't know of any black individuals that applied, so I don't know of any who were denied.

Q So you referenced Exhibit 49 as evidence of a conspiracy. Do you have any other -- and you referenced the issuance of building permits beginning in 1976 -- do

54 (Pages 195 to 198)

Stormo Reporting, Inc. (303) 200-4792

199

you have any other evidence supporting this conspiracy?
A I don't know when the regulations started for the floodplain/floodway issues, when that was actually, you know, rubber-stamped and said this is the way it is, but -- you know, I mean, I even know of another property that's not on Flagg Drive that was an existing house which was torn down and rebuilt three times the size, and subsequently is about this far (indicating) from the creek, which is about --
Q This far being --
A 18 -- well, 2 feet or so from the creek. And it was built by a white doctor, so it's not necessarily a conspiracy on Flagg Drive. It just seems that, you know, if you're the wrong color, you can't get a permit. Now --
Q But you're the only person that was the wrong color that you're aware of?
A Yes.
Q Any other evidence you can think of related to the conspiracy?
A Not at this time.
Q Were the members of the Board of County Commissioners involved in this conspiracy?
MR. McKENDREE: Objection. Foundation. Competency.

200

A Well, it seems like they didn't want to get caught up in the conspiracy.
Q (By Mr. Hughes) So were they or were they not involved in the conspiracy?
MR. McKENDREE: Same objection.
A I -- I don't know.
Q (By Mr. Hughes) You don't know whether the members of the Board of County Commissioners were involved in the conspiracy?
A I don't.
Q Do you know whether the Board of County Commissioners were aware of a conspiracy?
MR. McKENDREE: Same objection.
A I don't know if they were aware of anything or involved in anything.
Q (By Mr. Hughes) Have you told me everything you know at this time about why you believe Boulder County discriminated against you based upon race?
A Everything that I could think of.
Q Turning back to Exhibit 27, could you take a look at your response to Interrogatory No. 1, which is on page 5. In Interrogatory No. 1, you were asked to identify where you believe the proper location of the floodway, if any, is on the property and how you determined that location. For purposes of reference,

201

"the property" being Flagg Drive.
And your response was, It is Plaintiffs' contention that there is no floodway; is that correct?
A Yes.
Q What do you base your contention that there is no floodway upon?
A I did a lot of research on this, after the word "floodway" was introduced to me, and the various engineers that -- civil engineers -- that I spoke to, for the most part, all said that they thought it was kind of ridiculous.
One specifically came out on the property, did various measurements, went a half-mile downstream of me to the bridge over Baseline -- I mean -- well, the bridge over the creek at Baseline and measured that and looked at documents and basically said it wasn't so much that the property was in a floodway, that it was in a backwash, which meant the water got bound up by the old bridge and started to just build up because of it being -- well, the original bridge there had a -- I forget what they call that thing -- a big pipe you could walk through almost, but I mean, nothing like the opening that's there now -- so consequently it would dam up the water, and it would start to back up and then swirl across Flagg Drive and just be standing water, for the

202

most part, on what would be the properties on the west side of the street.
He also said that since the new bridge's construction that is no longer the case. There would be no backwash, therefore, there wouldn't be any standing water or flood-type water. And also over the course of the six years or so that I've been in the area --
Q I don't want to interrupt, but what was the name of that -- of that engineer that you were talking about?
A Curtis with the weird last name, and I can't think of his last name.
And then over the course of the six years or so being on or near the property, I've watched the creek, and at various times, when other creeks in Boulder County were high and threatening to overflow their banks, I thought, Whew, well, since I'm in this raging floodway, I'd better go check that creek and make sure I shouldn't, you know, evacuate.
So I'd go down to the creek, and it hadn't changed in depth, perceptively, at all or speed or anything else for that matter, so it's kind of my determination that it really isn't a floodway.
Q Who are the other engineers you talked to, besides Curtis, who you couldn't remember his last name?

219

Q    And this letter's in your handwriting?
A    Yes.
Q    And it's your signature at the close of this letter?
A    Yes.
Q    Who is Bob Wheat?
A    Believe he was a representative of the second mortgage company.
Q    And this letter's dated July 23, 2003?
A    Yes.
Q    I'd like to turn your attention to the last paragraph on page 2 of the letter and the top of the paragraph of page 3 of the letter.
A    I'm sorry. Where?
Q    The bottom of the second page of the letter and the top of the third page.
MR. McKENDREE:  Continued on the top.
Q    (By Mr. Hughes)  And in that letter, you made the statement, "The assumption is that the County was willing to forever ruin this property to prevent to (sic) kennel or to buy the land cheap for County Open Space."  Is that what you said?
A    Yes.
Q    So, at least as of July 23, 2003, one of your theories for the County's motivations, with respect to

220

the Flagg Drive property, was that the County wanted it for open space?
A    Yes.
Q    And another of your beliefs, as of July 23, 2003, was that the County was trying to prevent a kennel at the property?
A    Because I was trying to have the kennel at the property.
Q    Is there anything in this letter that indicates that Boulder County's actions were motivated by racism?
A    Well, when it says, "This floodway business came about because Tynia Johnson wanted a kennel...," I was pretty well referring directly to me, who would be a black woman, and so I'm thinking that was kind of the point I was trying to make.
Q    Had Mr. Wheat ever met you in person?
A    No.  But we had talked on the phone.
Q    Did you tell him you were black?
A    I did.
Q    Why did you tell him you were black?
A    Because we were talking in the context of this case, which wasn't actually a case at that time, but this whole situation.
(Deposition Exhibit 64 was marked.)

221

Q    (By Mr. Hughes) I'm handing you what's been marked as Exhibit 64.  Do you recognize that document?
A    Huh. No.
Q    I'll represent to you that this is a document that you produced to Boulder County in response to our request for production of documents.  Do you know why that document might have been in there?
A    No.
Q    Looks to me like this document, Exhibit 64, references a vacation of roads and alleys in the Irvington townsite in Blocks 15, 16, 17, 18, and 19 and the division of property, 10 acres, into 8 one plus or minus sites.  Is that the Flagg Drive property?
A    Um --
MR. McKENDREE:  Given the pause, I'm going to object on a competency basis.
A    -- um -- I don't know what this pertains to actually, and it's dated 1985, well before I -- no, actually, I was in Boulder.  I was in Boulder, but I was in school.
MR. McKENDREE:  There's no pending question.
(Deposition Exhibit 65 was marked.)
MR. McKENDREE:  Is this 65?
MR. HUGHES:  Yes.
Q    (By Mr. Hughes)  I'm handing you what's been

222

marked as Exhibit 65.  Can you tell me what that document is?
A    Housing Assistance Payments Contract.
Q    And what is -- is this a document that you filled out?
A    Yes.
Q    Okay.
Were you -- this document indicates that you were a tenant at 6303 Arapahoe Road in Boulder?
A    Yes.
Q    Okay.
And were you a tenant at 6303 Arapahoe in Boulder?
A    Yes.
Q    Okay.
And did you receive housing assistance payments with respect to that tenancy?
A    I did.
Q    How long did you receive those payments?
A    I don't really remember.
Q    When did you begin receiving the payments?
A    December 1997.
(Deposition Exhibit 66 was marked.)
Q    (By Mr. Hughes)  I'm handing you what's been marked as Exhibit 66.  Do you know what that is?

60 (Pages 219 to 222)

Stormo Reporting, Inc.  (303) 200-4792