IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 04-cv-0245-RPM

DEPOSITION OF PATRICIA SAINT CYR
EXAMINATION DATE:   FEBRUARY 10, 2006

TYNIA JOHNSON, a resident of Boulder County, Colorado and PATRICIA SAINT CYR, a resident of Orleans Parrish, Louisiana,

Plaintiffs,

v.

BOULDER COUNTY, a Political Division of the State of Colorado, by and through its BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER, COLORADO, PAUL DANISH,
RONALD K. STEWART,
TOM MAYER,
JANA MENDEZ, and
DAVID WEBSTER,

Defendants.

COPY

        PURSUANT TO NOTICE, the deposition of PATRICIA SAINT CYR was taken at 1:51 p.m. on February 10, 2006, at 1325 Pearl Street, 5th Floor, Boulder, Colorado, before Nathan Stormo, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.


                    Nathan Stormo
            Registered Professional Reporter

2

                    A P P E A R A N C E S

For the Plaintiffs:

    JOHN W. McKENDREE, ESQ.
    Law Offices of John McKendree
    1244 Grant Street
    Denver, Colorado  80203
    (303) 861-8906

For the Defendants:

    DAVID HUGHES, ESQ.
    Office of the County Attorney
    Boulder County
    P.O. Box 471
    Boulder, Colorado  80306
    (303) 441-3190


Also Present:   Tynia Johnson
                Jaclyn Hamilton
                Antionette Mascarenas



                      I N D E X

EXAMINATION BY                                          PAGE

  Mr. Hughes. . . . . . . . . . . . . . . . . . . .      4
  Mr. McKendree . . . . . . . . . . . . . . . . . .     64


                    E X H I B I T S

  NO.          DESCRIPTION                            PAGE

   1*     Plaintiffs' Amended Verified
          Complaint . . . . . . . . . . . . . . . .    10

  27*     Plaintiffs' Verified Responses to the
          First Combined Discovery Request. . .        11

  29*     Warranty Deed dated 10/27/99
          regarding 12416 Flagg Drive . . . . . .      13

  41*     Memorandum of Understanding dated
          9/20/1999 . . . . . . . . . . . . . . . .    23

  51*     Resolution 2002-51. . . . . . . . . . . .    37

                Stormo Reporting, Inc.   (303) 200-4792

PROCEEDINGS

PATRICIA SAINT CYR

The deponent herein, being first duly sworn to testify to the truth in the above cause was examined and testified on her oath as follows:

EXAMINATION

BY MR. HUGHES:

Q  Could you state your full name, please.

A  Patricia Miller Saint Cyr.

Q  What is your current address?

THE DEPONENT:  See, he's laughing at me.

MR. McKENDREE:  She's a Katrina victim.

A  5742 Elysian Fields, New Orleans, 70122 is my home address, but that's not where I'm living.

Q  (By Mr. Hughes)  You're not currently located at that address?

A  No.

Q  What address are you currently located at?

A  This week 623 White Pine Drive, Durham, D-u-r-h-a-m, North Carolina, 27705.

Q  As I said earlier, my name is David Hughes, and I represent the official capacity defendants in this case in the lawsuit that you and Ms. Johnson brought against these defendants.

Have you ever been in a deposition before?

A  No.

Q  There are three things that I wanted to tell you about to kind of make the deposition go a little more smoothly and make it a little different than sort of a general conversation that we might have on the street.

First, it's important to try to remember to answer the questions out loud.  The court reporter can't really capture a nod of the head or a shake of the head or even saying "uh-huh" or "huh-uh" instead of yes or no.

The second is, try to let me finish my question before you answer.  It's natural for people to sometimes anticipate what the question is going to be, and then answer the question before it's finished.  But it's hard for the court reporter to make a record if we're interrupting each other.

The third is, please tell me if you either don't understand or you can't hear a question that I ask you.  Will those all work for you?

A  Yes, they will.

Q  And it's important to remember that even though we're not in a courtroom and sitting in front of a judge, and we're sort of in an informal atmosphere, you are still under oath and need to answer as you would as if you were in a courtroom in front of a judge.  Do you understand that?

A  Yes, I do.

Q  How is your health today?

A  My health is okay.

Q  Are you -- do you have any health conditions or are you taking any medications or other substances that may affect your ability to participate in this deposition and answer questions fairly and accurately?

A  No.

Q  If at any point during the deposition you need a break, just be sure and let me know, and I'll give you -- finish up my question and give you an opportunity for a break.

A  Okay.

Q  What did you do to prepare for today's deposition?

A  Spoke to the attorney for about ten minutes.

Q  Did you review any documents?

A  No.

Q  Did you meet or discuss the case with Ms. Johnson?

A  No.  We just -- she just was telling me what you were telling me about what to expect.

Q  But nothing about the substance or the --

A  No.

Q  -- facts of the case?

A  No.

Q  Did you discuss this case with anybody else prior to the deposition?

A  No.

Q  What was your address between 1999 and the year 2004?

A  The 5742 Elysian Fields.

Q  Did you live anywhere else during that period of time?

A  Only travel.

Q  Vacations and that sort of thing?

A  Yes, and to see my children.

Q  Have you ever lived in Boulder, Colorado?

A  No.  Just visiting.

Q  What was your primary source of income between 1999 and 2004?

A  You mean where I got it from?  What do you mean; how much?  What do you mean by that?

Q  How did you earn your money primarily?

A  I was a landlord and on disability.

Q  So you owned rental properties?

A  At that time.

Q  How did you acquire those rental properties in

4 (Pages 4 to 7)

Page 8

the first place?

A   My parents.

Q   You inherited them?

A   Yes.

Q   Were you employed between 1999 and 2004, other than being a landlord?

A   No. I was on disability still.

Q   Are you currently employed?

A   No.

Q   Have you ever been a party in a lawsuit before this one?

A   Just from the accident that I had with my back. Is that what you mean?

Q   Would that be the --

A   Disability.

Q   -- the disability case?

A   Uh-huh.

Q   You have to say yes or no.

A   Oh, yes. I'm sorry.

MR. McKENDREE: It's okay to say "oh, yes."

THE DEPONENT: I'm trying to keep up with these dates.

Go ahead.

Q   (By Mr. Hughes)  That was the lawsuit involving Kathryn Stoutshop (phonetic)?

Page 9

A   Yes.

Q   Were you a plaintiff in a lawsuit along with Ms. Johnson against somebody named Terry Borger?

A   I have no idea what that is.

Q   Involving the Arapahoe property.

A   I don't know.

Q   I'm showing you what's been marked as Exhibit 95. Does this document look familiar to you at all?

A   Huh-uh. I didn't sign anything.

Q   So do you recall being a named plaintiff in a lawsuit entitled Tynia R. Johnson and Patricia Saint Cyr versus Terry W. Borger?

A   Okay. I know of the incident, the matter, but as far as a case and going to court, I don't remember all of that.

Q   And what was the incident and matter, to your recollection?

A   The lady sold the property with the gas tanks underneath the property in the front. That's all I know about.

Q   And this is in reference to some property on Arapahoe Road in Boulder, Colorado?

A   Yes.

Q   Do you recall why the lawsuit was dismissed or

Page 10

if it was dismissed?

A   I don't know the ins and outs.

Q   Have you ever been convicted of a crime, other than a traffic offense?

A   No. I'll say that loud.

Q   I'm going to hand you a book of exhibits. These are original exhibits from prior depositions, and I would like to ask you to turn to Exhibit 1. They are tabbed on the side so it's pretty easy to find.

MR. HUGHES: Is 1 in there?

THE DEPONENT: No, they start at 28.

MR. McKENDREE: It starts at 27.

(Discussion off the record.)

MR. McKENDREE: What he wants you to do is read this and write him a report in 15 minutes.

THE DEPONENT: We're in the classroom.

Q   (By Mr. Hughes)  If you could take a look at Exhibit 1, and there's a sticker on the front that I will take off because that is not part of the exhibit.

A   What am I supposed to do; read all of this?

MR. McKENDREE: Wait.

Q   (By Mr. Hughes)  No. I'm going ask you some questions about it.

Do you know what that document is?

A   Not really.

Page 11

Q   Okay. For purposes of the record, I'll identify the document as Plaintiffs' Amended Verified Complaint. Do you know whether you've ever reviewed that document in the past?

A   No.

Q   Do you know whether you've reviewed any of the allegations contained in that document?

A   It's been a while. Oh, this is the one I signed. Okay. Let me put it like this: I read this, but to go back and tell you something about it, I can't remember that.

Q   Okay. In that notebook in front of you -- hopefully this one will be in there -- could you turn to Exhibit 27. Have you reviewed this document before today?

A   No.

Q   So you don't remember reviewing that document?

A   No.

MR. McKENDREE: Answer audibly.

THE DEPONENT: What?

MR. McKENDREE: Be sure to speak out your answers.

THE DEPONENT: Okay.

A   No.

Q   (By Mr. Hughes)  I heard you.

5  (Pages 8 to 11)

12

MR. McKENDREE: She was shaking her head first.

MR. HUGHES: Oh, okay. I wasn't watching you, but I heard you.

A    I'm doing this, and then I'm going back, and I said no.

MR. McKENDREE: What she's doing -- I'm going to woodshed her in your presence.

What she's doing is thinking out loud.

And you don't want to do that. You just want to answer the question after you've thought about what the answer correctly is, okay?

THE DEPONENT: Okay.

(Ms. Hamilton left the deposition.)

Q    (By Mr. Hughes) To the best of your recollection today, have you ever had any contact with Boulder County land use staff between 1999 and 2004?

A    Of what?

Q    Have you had contact with Boulder County land use staff between 1999 and 2004?

A    No.

Q    Do you remember having contact with anyone employed by Boulder County during that time frame?

A    Like a conversation or a letter?

Q    Any sort of -- yes, a conversation, letter; any sort of interaction you might have had with anyone

13

employed with Boulder County.

A    No.

Q    Have you ever met David Webster?

A    David Webster. No.

Q    Have you ever met Paul Danish?

A    No, I can't say I remember those names.

Q    Have you ever met Ronald K. Stewart?

A    No.

Q    Have you ever met Tom Mayer?

A    No.

Q    Have you ever met Jana Mendez?

A    No.

Q    You purchased a property at 12416 Flagg Drive with Tynia Johnson; is that correct?

A    Yes.

Q    Do you remember when that purchase took place?

A    No, I can't remember the date and the year.

Q    Could you turn to Exhibit 29 in that book in front of you.

For purposes of the record, I will identify that as a deed to the Flagg Drive property. Does that refresh your recollection regarding the date that the Flagg Drive property was purchased by you?

A    Are there any signatures?

That's what it says.

14

Q    Do you remember what date it was?

A    No, I don't remember the date.

Q    Do you think it was approximately October of 1999?

A    Well, I mean, that's what's on here.

Q    That's what's on Exhibit 29?

A    But there are no signatures, so I can only go by what's written here. I don't remember what day it was.

Q    Right.

A    But I know we did it.

Q    And do you remember if it was approximately the year 1999?

A    I don't know what else to tell him. It's written here.

MR. McKENDREE: He's asking you, do you remember --

A    Okay. I don't remember what date it was.

(Ms. Hamilton entered the deposition.)

Q    (By Mr. Hughes) Okay.

A    I'm not good at dates.

Q    Tell me what you do remember about the purchase of that property.

A    The real estate person from Keller Williams -- I'll think of her name after a while -- and I just

15

remember us going to the title office, signing off, you know, all these thousands of papers that you have to sign when you're getting something; buying property. It was nice weather, so I'm thinking it wasn't wintertime.

Do you want me to tell you what happened during the signing? Is that what you're asking me? Let's get on the same page.

Q    Well, let me first clarify your original answer, and then I'll try to give you a little bit more guidance in terms of what I'm asking you about. When you say you remember "us" going to the title office --

A    Oh, my daughter and myself and the real estate lady.

Q    And your daughter is Ms. Johnson?

A    Yes.

Q    And you don't recall right now the name of the real estate lady?

A    No, other than she worked at Keller Williams.

Q    What do you remember about your decision to purchase that property? In other words, why did you decide to purchase it?

A    Okay. I was the co-signer. My daughter is the one that wanted the property, and trying to help her out. This is what she wanted to do. She wanted the property, and we thought it was a good investment, so

6 (Pages 12 to 15)

16

that's what she wanted to do, or particularly land especially here in the Boulder surroundings. It's supposed to be such a good investment.

Q   What did Ms. Johnson tell you about the property and the reason why she wanted it?

A   To eventually run a business, live on it.

Q   Did she tell you what kind of business she wanted to run?

A   Uh-huh, yes, she did.

Q   And what was that business?

A   A dog kennel; boarding, dealing with dogs -- animals, not just dogs; animals.

Q   Why did Ms. Johnson ask you to go in on her with this purchase?

A   Because, like I said, again, that was my child, and it seemed like a good opportunity that we could all reap the benefits later.

Q   Do you know why she decided not to do it just by herself?

A   You mean without me co-signing for it?

Q   Correct.

A   That wasn't going to happen.

Q   Why not?

A   I don't know. Either she didn't have the funds -- you're talking about few years back. I can't

17

remember that.

Q   I understand that.

A   I have two other children and Katrina. I'm sorry, I had to say it.

Q   Did you have any information on whether Ms. Johnson qualified for a mortgage for the Flagg Drive property without you as a co-applicant?

A   I don't remember that.

Q   At the time you purchased the property with Ms. Johnson, did you feel fairly comfortable about your ability to make the required mortgage payments on the property?

A   Me making payments?

Q   Yes.

A   Say that again.

Q   At the time you purchased the property, did you feel fairly comfortable with your ability to make the required mortgage payments on the property?

A   Yes, at that time.

Q   Was that based on the rental income from the other properties that you --

A   Yes.

Q   -- owned?

Let me go ahead and finish the question.

A   Go ahead.

18

Q   Was that based on your rental income from the property you owned other than the Flagg Drive property?

A   Yes, and the fact that she was going to be working in order to help pay for that.

Q   "She" being Ms. Johnson?

A   Yes.

Q   Before purchasing the property, did you and Ms. Johnson reach an arrangement regarding who would be responsible for the mortgage payments?

MR. McKENDREE:  You mean for the making of the mortgage payments; paying the money?

MR. HUGHES:  Yes.

MR. McKENDREE:  Thank you. I've spoken to my client, so that was the only reason for the interruption.

Go ahead.

A   She was going to pay for it.

Q   (By Mr. Hughes)  "She" being Ms. Johnson?

A   I'm sorry, Ms. Johnson is going to pay for it.

Q   It seems a little weird that I keep correcting it when it seems like everybody knows what we're talking about. But somebody else is going to be reading this, and they can't really get the context of these things, so that's why I'm being meticulous. It's not to be difficult or anything like that.

19

MR. McKENDREE:  Sure.

MR. HUGHES:  At least that's what I say.

Q   (By Mr. Hughes)  And how would that arrangement, in terms of Ms. Johnson being responsible for making the mortgage payments, work? In other words, was she required to send the mortgage payments directly to the mortgage company, or was she required to send payment to you who would, in turn, send the payments to the mortgage company?

A   Oh, no, she would send it to the company.

Q   Was there any arrangement in terms of payment of rent on the property?

A   No.

Q   Ms. Johnson wasn't required to pay you rent?

A   No. Just keep up on the payments.

Q   You never lived at the Flagg Drive property, did you?

A   You know, I stayed there maybe two, three -- maybe two weeks at a time, but I had to keep running back and forth home. I had two other children.

Q   When you say "two weeks at a time," do you mean like two weeks over a year period; something like that?

A   No. It was a little bit more often than that. It was a little more often. Christmastime I would stay a little bit longer. She has a daughter, and we enjoyed

7 (Pages 16 to 19)

20

spending Christmas up here. When I say "we," I mean my other -- my youngest daughter, her son and myself and my son. And then prior to that is maybe every three, four months I would come in.

Q   Did you intend to live at the Flagg Drive property at the time you purchased it?

A   That's a long answer.

MR. McKENDREE:  If you can't give him a short one, give him a long one.

A   I really don't -- I can't tell you. I don't know. I had thought about it and just couldn't get it to work out at that time.

Q   (By Mr. Hughes)  Did you have any sort of written agreement with Ms. Johnson regarding the Flagg Drive property?

A   No.

Q   Did you have any responsibility for making mortgage payments if Ms. Johnson failed to send in a mortgage payment?

A   No.

Q   Why not?

A   Because I thought she was going to handle it.

Q   "She" being Ms. Johnson?

A   I'm sorry, Ms. Johnson. Ms. Johnson was supposed to handle it.

21

Q   Eventually the Flagg Drive property was sold at foreclosure; is that correct?

A   Yes, it is.

Q   Do you know when the mortgage payments stopped being made on the property?

A   No.

Q   Do you know why the mortgage payments stopped on the property?

A   Oh, yes.

Q   Why is that?

A   We're going back to the animals, the business, the income coming in.

Q   The income coming in on Ms. Johnson's --

A   Yes.

Q   -- kennel business?

A   Yes.

Q   And that business ceased to operate?

A   I have to say this --

THE DEPONENT:  Can I say it?

MR. McKENDREE:  You can say whatever you want, ma'am.

A   Thanks to Boulder County, yes.

Q   (By Mr. Hughes)  And why do you say "thanks to Boulder County"?

A   For all the stuff that went through, went --

22

passed by. All the -- I guess I shouldn't have opened up that can of worms. Okay. Let that go by too.

Q   Well, when you say "all the stuff," what specifically do you mean?

A   Oh, all the rules and the thing about the fence and the 100-year or the 1,000-year floodplain or something.

Q   So in terms of Ms. Johnson's ability to operate the kennel and Boulder County's regulations -- I'm not trying to put words into your mouth, but I'm trying to understand what your answer is.

MR. McKENDREE:  Object to the form of the question.

You may answer.

A   That would be the whole situation. They just couldn't come to grips.

Q   (By Mr. Hughes)  Did you visit the Flagg Drive property prior to purchasing it?

A   Yes.

Q   Is the name of the real estate broker who represented you Ann Cooper?

A   Yes, that's her.

Q   At the time that you purchased the Flagg Drive property, did Ms. Cooper raise concerns to you that there might be difficulty in the resale of the property?

23

A   That, I don't remember.

Q   Okay. Could you open that exhibit book in front of you to Exhibit 41.

If you could just take a minute to look over that document and tell me whether that document is familiar to you at all.

A   The document does not -- no, I don't remember seeing this document, and I didn't sign it.

Q   Do you remember Ms. Cooper bringing to your attention the issue that there might be difficulty in the resale of the Flagg Drive property because of Flagg Drive running through the acreage?

A   That was not disclosed to me.

Q   Do you recall Ms. Cooper having any discussion with you about the difficulty in appraising the property at the price that was being offered?

A   No.

Q   I don't suppose you remember what your adjusted gross income was in the year 1999? I certainly wouldn't remember what mine was.

A   No, I don't, and have fun trying to find the papers.

MR. McKENDREE:  Are they a little soggy, are they?

THE DEPONENT:  A little soggy. They're at the

8  (Pages 20 to 23)

44

Q Yes. Is this another document that was signed by Patricia Miller Saint Cyr by Ms. Johnson as attorney in fact on your behalf?

A That's what's written.

Q And you believe Ms. Johnson was authorized to sign this document on your behalf?

A Yes, I guess so. I have no idea what this is.

Q It appears this document was notarized as well; is that correct?

A Yes.

Q Could you take a look at the document towards the top where there is an X, and does that document state as follows: "We the undersigned purchasers of the above captioned property understand that one of the conditions of our loan is that we occupy the subject property and we do hereby certify as follows:

"We will occupy the subject property upon close of escrow; if unable to occupy by close of escrow, we will occupy by the following date: 10/29/99." Is that what Exhibit 92 says?

A That's what it says.

Q And a couple of paragraphs below that, Exhibit 92 states, "We are aware of and understand that if we fail to move in to the property by the specified time that we are subject to prosecution under Section

45

1010, Title 18, United States Code, Federal Housing Administration Transactions, and that we are liable to be fined not more than $5,000, or imprisoned not more than two years or both." Do you see that document?

A Yes.

Q But you never moved into the Flagg Drive property?

A I never moved in permanently. It's like Elysian Fields. I don't stay there 365 days a year.

Q Did you ever occupy the Flagg Drive property as your permanent residence?

A Yes. I even worked here for a while. I guess I go to jail now, huh?

MR. McKENDREE: Can we take a break?

MR. HUGHES: Okay.

(A recess was taken from 3:07 to 3:21 p.m.)

Q (By Mr. Hughes) I'm handing you what's been marked as Deposition Exhibit 93. Is this the loan application for the Flagg Drive property?

A I don't know since I wasn't -- my signature -- this is '99; 10/27/99?

Q The date on Exhibit 93 is October 27, 1999. Is that what you're asking?

A Yes.

And this is for what property -- oh, that's the

46

Flagg Drive. I thought it was '99.

Q Does this appear to be the loan application for the Flagg Drive property, Exhibit 93?

MR. McKENDREE: Objection; foundation, competency as phrased.

MR. HUGHES: I'm sorry, what was the problem with the question?

MR. McKENDREE: Objection to her competency to respond as you phrased it.

A I know I'm supposed to omit what he says. I don't know.

Q (By Mr. Hughes) If you turn to Page 3 of Exhibit 93, this is a document signed by Patricia Saint Cyr by Ms. Johnson as attorney in fact on your behalf?

A Yes.

Q And do you recognize Ms. Johnson's signature on this document?

A I take it that's hers.

Q And if you turn to the fourth page of the document, at the bottom of the page it indicates that this document was prepared by virtue of telephone interview by someone named Asa Jenkins. Do you remember anything about such a telephone interview?

A No.

Q Do you know whether Ms. Johnson was authorized

47

to sign this document on your behalf?

A Yes, I guess so.

Q And did you understand that Ms. Johnson was filing a loan application on your behalf?

A Yes, I guess she was.

Q Okay. On the first page of Exhibit 93, there are some checked boxes under the category of "Property will be," and I'll just point that out to you so you don't have to look --

A Right here?

Q Right here.

A Okay.

Q Do you see that?

A Uh-huh.

Q Is that a yes?

A Yes, I'm sorry.

Q That's okay. And under the checked box "Property will be," the box that is checked is "Primary Residence"; is that correct?

A Yes, it is.

Q Okay. Now, farther down on the page under the category "Borrower's Name," do you see your name there where it says Patricia Miller Saint Cyr?

A Yes, I do.

Q And it says your present address is 6303

14 (Pages 44 to 47)

48

Arapahoe Road, Boulder, Colorado; is that correct?

A   That's what's written here, yes.

Q   Was that, in fact, your address at the time?

A   When you say all the time, are you talking 12 months out of the year?

Q   The question was -- and I apologize if I wasn't clear -- I said was 6303 Arapahoe Road in Boulder your address at the time?

A   At the time, don't know.

Q   Earlier you testified you have never lived in Boulder, Colorado; is that correct?

A   Not a whole length of time, no.

Q   What do you mean by "not a whole length of time"?

A   Not 365 days of the year.

Q   Okay. How many days of the year -- did you ever live at 6303 Arapahoe Road?

A   Uh-huh, yes; been there.

Q   How many days of the year did you live at --

A   Oh, no, I can't remember that.

Q   Further down on the first page of Exhibit 93, it has "Name and Address of Employer," and it says "Saint Cyr Consulting Services, Self-Employed." Do you see that?

A   Yes.

49

Q   Can you tell me what Saint Cyr Consulting Services is?

A   Consulting service, I have no idea.

Q   Were you ever -- did you ever operate a business called Saint Cyr Consulting Services?

A   Not to my knowledge.

Q   Okay. If you could turn to the next page of Exhibit 93, at the top of the page it indicates that your gross monthly income was $9,400 a month. Do you see that?

A   Yes.

Q   That's approximately $112,800 a year, isn't it?

A   I don't have a calculator.

Q   In the year 1999 you reported to the Internal Revenue Service that your adjusted gross income was $4,556 for the whole year; is that correct?

A   Yes.

Q   How do you account for that discrepancy?

A   I don't. I don't know.

Q   Towards the bottom -- or at the bottom of Page 2 of Exhibit 93, you indicate that your total personal assets were at $1,103,500; is that correct?

A   That's what it says.

MR. McKENDREE: Object to the form of the question.

50

Q   (By Mr. Hughes) I'm sorry, I didn't hear your answer.

A   I said that's what's on here.

Q   Was that an accurate statement of your assets at the time?

A   Well, I guess the other real estate counted in at that time.

Q   So do you believe that was an accurate statement of your assets at the time?

A   Yes.

Q   Okay. Turning two more pages on Exhibit 93.

MR. McKENDREE: 7452?

MR. HUGHES: That's correct.

THE DEPONENT: I have it.

MR. McKENDREE: Have you got it?

THE DEPONENT: Yes.

Q   (By Mr. Hughes) If you'll look towards the right-hand side of that page, you'll note a number of checked boxes; kind of towards the middle. Do you see those?

A   Yes.

Q   And next to checked box L it states, "Do you intend to occupy the property as your primary residence?" And there is a check mark next to that that says yes. Do you see that there?

51

A   Yes.

Q   I'm handing you what's been marked as Exhibit 94. This is another document Ms. Johnson signed on your behalf?

A   Uh-huh, yes, I see it.

Q   And you believe she was authorized to do so?

A   This has been a while. I don't remember.

Q   In the first --

A   I really don't remember all this stuff.

Q   In the first paragraph of Exhibit 94, it states, "I/We have applied for a mortgage loan from Firstate Bank of Colorado. In applying for the loan, I/we completed a loan application containing various information on the purpose of a loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information."

Do you see that paragraph?

A   No.

MR. McKENDREE: He read this right here.

THE DEPONENT: Oh, okay.

MR. McKENDREE: He read the fine print.

52

Q   (By Mr. Hughes) Do you see that paragraph in Deposition Exhibit 94?

A   Yes.

Q   Paragraph 3 of that document states, "I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014."

Do you see where it says that?

A   Where is that?

MR. McKENDREE: He's reading there.

THE DEPONENT: Okay.

A   Okay. Yes, I see it.

Q   (By Mr. Hughes) Okay. Now, earlier I had you looking at Exhibit 27, and I don't know if you recall, but earlier in the deposition you looked through Exhibit 27 and indicated that you didn't see your signature on that exhibit. Do you remember that?

A   Yes, I remember that. That was today.

Q   I'm handing you what's been marked as Exhibit 97. Would you review both pages of that document.

Have you reviewed Exhibit 97?

A   Question? I can't ask you a question.

53

MR. McKENDREE: He did. Have you reviewed it is the question. You have either reviewed it or you have not.

Say yes.

A   Yes.

MR. HUGHES: I object.

A   Reviewing it and understanding it -- okay. I've read it.

Q   (By Mr. Hughes) Do you know whether this document was intended to act as the signature verification provided by you with respect to Exhibit 27?

MR. McKENDREE: So stipulated.

A   Yes. My name is on here.

Q   (By Mr. Hughes) Could you turn back to Exhibit 27, and I would like in particular to refer to your response to Interrogatory No. 8. And I will find that page for you in just a minute.

MR. McKENDREE: Page 4 -- wait a minute.

MR. HUGHES: No, that's requests for production.

MR. McKENDREE: Page 7.

Q   (By Mr. Hughes) If you could just review the question and answer for Interrogatory No. 8 on Page 7. Take a minute to do that.

A   I'm reading this whole thing?

54

MR. McKENDREE: No. You're reading from here to there. Not even a whole page.

THE DEPONENT: Okay.

A   And what's the question?

MR. McKENDREE: There isn't. Have you read that page?

A   Yes, I've read it.

Q   (By Mr. Hughes) Okay. In your answer to Interrogatory No. 8, it indicates -- or you refer to a pattern of discriminatory behavior. Tell me what that pattern is.

A   Don't know.

Q   Is it your belief that David Webster discriminated against you because of your race?

A   Who is David Webster again?

MR. McKENDREE: He doesn't have to answer questions. He gets to ask them.

THE DEPONENT: Okay, but I don't know who David Webster is.

Q   (By Mr. Hughes) You don't remember who Mr. Webster is; is that correct?

A   That's what I said.

Q   Do you know whether Mr. Webster is one of the defendants in this case?

A   I don't know who he is.

55

Q   Who do you remember discriminating against you?

A   Boulder County.

Q   Anybody in particular at Boulder County?

A   The gentleman who was outside the house spying on us; whatever his name was.

Q   Okay. Which house are you referring to?

A   12416 Flagg.

Q   And what incident are you referring to in terms of the gentleman outside of your house?

A   The gentleman that would park across the street and take pictures.

Q   You don't know who that was?

A   No.

Q   Do you know why --

A   I don't know his name.

Q   Did you ever talk to that person?

A   No, because every time you would go up to approach, they would drive off.

Q   Do you remember when that incident or incidents took place?

A   Now we're talking these numbers again. No.

Q   And why do you believe the gentleman who was taking the pictures was discriminating against you based upon your race?

A   Well, because of all the papers and files and

16   (Pages 52 to 55)