# DEPOSITION OF
# DAVID WEBSTER

## *TYNIA JOHNSON, et al Vs BOULDER COUNTY, et al*

*IN THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLORADO*
*Case Action No. 04-CV-00245-RPM*

*Taken by PLAINTIFFS*
*MONDAY AUGUST 15, 2005*



Reported by:
Kerry Fremerman

Transcript provided by:



# THOMAS T. TOMKO
## AND ASSOCIATES, INC.
Registered Professional Reporters
820 Sixteenth St., Suite 530
Denver, Colorado 80202
(303) 825-1822

Page 25

Mr. Byrne that the information submitted by Mr. Kostecki was not going to change the outcome.

Q. Do you remember if you explained to Mr. Byrne why it would not?

A. I believe I did.

Q. Do you remember that you told Mr. Byrne the same thing you already described you stated to Mr. Kostecki?

A. I'm sure that was the case. I referenced the Boulder County Land Use Code and the requirements set forth there and how Mr. Kostecki's work submittal at that time was not suitable.

Q. Do you remember anything else that was said in the phone conversation between the two of you that you recall but have not yet recounted?

A. No.

Q. To the extent you remember this phone call, you've told me everything you remember about it?

A. Yes.

Q. Do you know the Plaintiff, Tynia Johnson?

A. I do.

Q. When did you first meet her?

Page 26

A. I believe it was October of 2001.

Q. Where?

A. In person in my office. In the transportation office, I mean. I had invited her to come in and take a look at some floodplain maps.

Q. Let me see if I understand that response.

I gather that you had some communication with her before this meeting in your office, either by phone, e-mail or some other kind of communication?

A. Yes.

Q. What was the nature of the first contact you had with the Plaintiff?

A. Miss Johnson contacted me on around October 10th, by telephone, I believe in response to the conclusion of the special use docket that she had applied for.

Q. By phone?

A. Yes.

Q. Was anyone else involved in that phone conversation between the two of you?

A. No.

Q. Do you remember it?

Page 27

A. Yes, I remember it.

Q. Describe it.

A. She was asking specifically about drainage patterns on her property in response to staff's comments provided on the docket referral and response. And at the time I told her I wasn't certain what she was speaking of.

Q. Was there anything else said in that phone conversation between the two of you that you recall but have not yet recounted?

A. I believe that I concluded by stating that I needed to check with other county staff to find out about a specific docket that she was talking about that I had no knowledge of.

Q. What was there anything else said that you recall but have not recounted?

A. No, I think that's it. The phone call was fairly simple and straightforward.

Q. Did you invite her to come see you in that phone call, do you remember?

A. No, not at that time. I didn't know anything about the property or the application.

Q. Sure. In your last few responses you've used the term "special use docket." For the reader of this record, what does that mean?

Page 28

A. Well, it's a land use application, an application made through the Boulder County Land Use Department for a specific type of use on a piece of property that maybe was intended for a different use or a change in use where the property was already designated as a different kind of use.

Q. And what is the form called that a property owner, who wishes to follow these procedures, utilizes?

MR. HUGHES: Object to the form of the question.

Q. (BY MR. McKENDREE) Is there a form, special form?

MR. HUGHES: Same objection.

Q. (BY MR. McKENDREE) Or do you know?

A. I don't know if there's a form.

Q. Okay. But the procedure that's invoked by whatever device then has some staff input; do you know that?

A. Well, in my previous answer, I stated I didn't know if there was a form. There is an application process that gets the process going.

Q. Are you familiar with that application process?

Page 73

Deposition Exhibit 5?

A. Deposition Exhibit 5 appears to be the special use review application.

Q. Is this the one that you spoke to my client about on October 10th, to your knowledge, of 2001?

A. Yes.

Q. After that conversation with her, did you have an opportunity to review Exhibit 5?

A. Yes. As I stated previously, I was interested in obtaining a copy of the packet as quickly as possible to know what was being proposed and whether or not I would need to make comments back to the land use department.

Q. See the Bates stamp "BCLU"? The first page of the exhibit has "BCLU 1143." See the area of the exhibit to which I make reference?

A. Yes.

Q. Using those numbers, which portions of Exhibit 5 did you find related to the questions put to you in your October 10, 2001 conversation with my client?

MR. HUGHES: Object to the form of the question.

A. I will say none of them, mainly because

Page 74

the context of that conversation on the telephone of October 10, 2001 was in regard to drainage patterns on the property.

Q. (BY MR. McKENDREE) And for the reader of this record, is there a difference between drainage patterns for this property and either a floodway or a floodplain.

A. Yes, there is.

Q. Describe that difference.

A. Drainage patterns would be a requirement for a submittal in connection with a drainage report in terms of how the property drains and whether or not it properly drains, based on what is proposed in terms of development.

It really doesn't have anything to do with conditions of flooding. So the nature of my review, initially when I was presented with this information over the telephone, was to look at the need for further information in regard to drainage on the site and not necessarily flooding.

Q. Do you know what BCLU 1131 is?

A. BCLU 1131 is a copy taken from the Boulder County land use zoning maps that were available at that time.

Q. See the area of the exhibit that

Page 75

somebody has, looks like, bold-marked on the exhibit, wrote the word "SITE," S-I-T-E, with an arrow?

A. Yes.

Q. Do you know what that depicts? Is that the Flagg Drive property?

A. It appears to depict the Flagg Drive property on a vicinity map.

Q. Would that similarly be true for BCLU 1132?

A. Yes.

Q. And for the reader of this record, what is 1132?

A. It's a map generated by the Boulder County Land Use Department to show a particular site relative to its surroundings on a zone map.

Q. After your conversation with my client on October 10, 2001, you reviewed, I gather, Exhibit 5?

A. Yes, I did.

Q. Did you have any conversations with anybody about the exhibit itself?

MR. HUGHES: Object to the form of the question.

A. I had a conversation with Miss Imeson.

Page 76

Q. (BY MR. McKENDREE) With specific reference to the exhibit, or the conversation you've already described?

A. I would say in regards to the application, Exhibit 5.

Q. Have you already described that conversation, or do you remember if you did?

A. I don't recall if you've asked me previously.

Q. With reference to Exhibit 5, describe your conversations with Miss Imeson regarding the application.

A. After the telephone call on October 10, 2001, I previously stated that I looked at the floodplain maps and determined that it was in a floodplain. And at that moment I went to Miss Imeson and asked her about this application, also known as Exhibit 5. And she began to explain it to me, and I think specifically talking about the fact that she had provided comments from our department and sent them back to land use. And I asked her about the drainage patterns comment and there wasn't much clarification there.

It really seemed, in my opinion, to be a nonissue more than anything else. And then I

Page 77

asked Miss Imeson, Did you realize that this property is in the floodplain? And her response was, It is, question mark. And I said, Yes, it is.

Q. Oh, it is? Or it is.

A. Her response was a question mark. It is?

Q. Okay.

A. And I said, Yes, it is. And the follow-up there was I needed to contact somebody from land use to let them know that we would have additional comments forthcoming.

Q. Do you understand that as a consequence of this conversation with Miss Imeson, she had not yet commented to Boulder land use that this was a floodplain or floodway problem?

A. That is correct. No communication about its floodplain status had been made, to my knowledge, with Miss Imeson's comments.

Q. Do you know Pat Mayer?

MS. JOHNSON: Mayne.

MR. McKENDREE: How are you spelling that?

MS. JOHNSON: M-a-y-n-e.

Q. (BY MR. McKENDREE) Pat Mayne?

Page 78

A. Yes.

Q. Who is she?

A. A county attorney.

Q. Did she have any conversation with you about my client's role in processing Exhibit 5?

MR. HUGHES: I object to the extent it calls for any attorney-client communication.

MR. McKENDREE: I'm not asking for any advice here.

MR. HUGHES: Okay. Maybe if you specified the date.

MR. McKENDREE: Sure.

Q. (BY MR. McKENDREE) At any time in connection with your follow-through of October -- after the October 10th phone call, did she -- that is, Pat Mayne -- tell you that she had communication with my client?

A. No.

Q. Do you know Greg Oxenfeld?

A. Yes.

Q. Who is he?

A. Greg is a planner on staff with Boulder County Land Use Department.

Q. Did you ever have any conversation with him of and concerning Exhibit 5?

Page 79

A. Yes, I did.

Q. When?

A. On October 10, 2001, I'm sure.

Q. Do you remember what was said between the two of you?

A. Yes. I informed him that a docket with a referral and response period that had already expired was -- included a property that was in a floodplain and I needed to provide comments on that. And -- well, I informed him that it was in a floodplain. And he asked if he could have my comments immediately. So I completed my review of Exhibit 5 and prepared my comments.

Q. What page or pages of Exhibit 5 did you utilize, if any, to determine that the Flagg Drive property was in the floodway or floodplain?

A. BCLU 1131, BCLU 1132, BCLU 1134 and 1135.

Q. Okay, stop. I'm going to -- we'll go through them again.

With reference to BCLU 1131, what are the notations or references on this page of Exhibit 5 that depict it is a floodway or floodplain property?

MR. HUGHES: Object to the form of the

Page 80

question.

A. There is a flood overlay district zone delineated on the map or depicted on the map, which upon first sight would suggest that the property is potentially in a floodplain.

Q. (BY MR. McKENDREE) What are those notations?

A. The reproduced copy has cut off the zoning district so that you can identify what is being used to graphically show what the floodplain is, but it appears to me like a diagonally crosshatched zone that goes through the property and follows Coal Creek up here.

Q. There are the notations that look like little airplanes. You're not referring to those, right, that run from the right to the left towards the top of the document?

A. No. I'm referring to -- they look like streams, but in actuality they're a reproduction of the flood overlay district boundaries in the county. It's a crosshatched shaded zone with diagonally oriented dashes. And you can see little bubbles or cut-outs on the inside that would suggest those are zones that are outside of this flood overlay district. And so it's going

Page 125

in this particular case. This is the first application that I had the opportunity to comment on.

(Recess taken.)

(Deposition Exhibit 13 was marked for identification.)

Q. (BY MR. McKENDREE) Sir, do you know what Deposition Exhibit 13 is?

A. From a quick review of the first two pages, it looks like a list of permits issued on Flagg Drive between 1974 and 2003.

Q. Do you know whether or not any of these permits are for structures being authorized to be constructed in the floodway?

A. Well, with the exception of the very last one concerning the bridge in February of 2003, I don't have knowledge of any of these permits.

Q. At all?

A. At all.

Q. Okay. Tell me about the bridge. Was that built in the floodway? The break-away bridge we're talking about, right?

A. Right. Yes, it was built in the floodway.

Page 126

Q. Who owns that bridge? The county?

A. The county does.

Q. What was the criteria for giving the county different treatment than others?

MR. HUGHES: Object to the form of the question.

A. No other treatment was given to the county.

Q. (BY MR. McKENDREE) Why were they permitted to build a structure in the floodway, do you know?

A. The structure is specifically designed to not be an encroachment during times of flooding. And it cost the county quite a bit more to construct that type of structure versus a conventional bridge.

Q. Was that because it's a break-away bridge?

A. Yes.

Q. Are there not fences that can be built that break away as well?

A. I'm sure there are. I don't know that I've seen a design for a break-away fence in a floodway. As a matter of fact, I haven't seen a design for a break-away fence in a floodway.

Page 127

Q. There are fences, however, that you -- well, are you aware that there are, in fact, fences at that can be built in a floodway in a manner so as not to impede the inundation when it comes?

A. I'm not aware of a specific design because none has been submitted to date.

Q. Did you recommend to my client that she seek to find such a design?

A. I may have. I don't recall.

(Deposition Exhibit 14 was marked for identification.)

Q. Sir, I place before you a purported letter on Ed Byrne's stationery with some attachments, dated April 22, 2002, allegedly addressed to you and others. Have you seen this document before?

A. I believe so, yes.

Q. Is it a letter you received from Ed Byrne?

A. Yes, it is.

Q. Requesting explanation, as it says in its re heading, of unequal treatment of similarly situated applicants. Was this letter, when you received it, in the form that you see it in this

Page 128

exhibit?

A. It may be. It was four years ago almost, so --

Q. Do you have any reason to believe it is not?

A. No. I'm sure it is.

Q. What, if anything, did you do in the interest of Boulder County when you received this document?

A. I believe I provided a copy to my immediate supervisor.

Q. Did you have a conversation with anybody in the transportation department about this letter or the allegations contained therein?

A. I'm sure I had a conversation with my supervisor about the contents of this letter.

Q. Did you look into or conduct any investigation after those discussions?

A. No, I don't believe so. If they were not open applications or projects that were under construction at the time, then I don't know that there was much that the transportation department could do to reverse the situations.

Q. Did you seek to ascertain whether or not the allegations of alleged unequal treatment by

Page 141

a building permit and the argument as to whether or not it's even a structure.

Q. On the second page of the letter, BCLU 1183, the second full paragraph beginning with the phrase "On the west side of Flagg Drive, the existing and proposed interior" and so forth, read that paragraph to yourself.

Can you make any recommendations regarding the contents of that paragraph?

A. Well, Mr. Byrne is simply stating his opinions about the possibilities of constructing wood fence on the property and how it seems to comply with the floodplain regulations.

Q. Right.

A. However, he doesn't have any other documentation that would support that; specifically, ground elevations submitted by a licensed surveyor. He doesn't have documentation that shows placement of those fencing -- of those fences would not adversely affect the efficiency of the floodway. He's simply stating his opinion.

Q. Right. My question is, however, did you make any recommendations regarding the contents of this paragraph?

MR. HUGHES: Object to the form of the

Page 142

question.

A. I don't understand.

Q. (BY MR. McKENDREE) Do you take into account the matters set forth in this paragraph, examine any document, conduct any investigation and then make any recommendation to anybody regarding the matters contained in this paragraph?

MR. HUGHES: Object to the form of the question.

A. Well, I think Mr. Byrne makes some good points. And some discussion, either prior to or after the time that this letter was sent, did occur between myself and the Plaintiff. And I believe in part that some of that conversation is what prompted the survey information to be collected by Mr. Grabowski.

And the results of the survey information, although it was not stamped and signed by Mr. Grabowski, who apparently is a licensed surveyor in the state of Colorado, it was encouraging to me personally because I felt that the applicant potentially had more property on high ground than the floodplain maps indicated. And not necessarily in response to this letter, but partly in connection with the issues that were

Page 143

raised, I urged the Plaintiff to prepare a submittal to FEMA as part of a LOMA application -- that's L-O-M-A -- for a map amendment for their review and determination in showing whether or not more of the property was considered outside of a special flood hazard area.

Q. (BY MR. McKENDREE) When did you have that conversation with my client?

A. Several times and I don't recall the dates.

Q. Before or after the supplemental application?

A. I believe I had it before and after supplemental application was made, and quite possibly even after such time that the board of county commissioners made their final decision concerning the application.

Q. Do you recall whether or not she asked you, as I would, how an application -- a LOMA application to FEMA would help in light of the conclusion of the county and its maps that a floodway existed? How could FEMA help that?

A. FEMA could help by reviewing a submittal packet that she put together showing that her property was on high ground. They sent her a

Page 144

letter stating that so much of her property -- probably not all of it, but a lot more than currently is -- is outside of a special flood hazard area. And upon submittal of those documents, she doesn't need a floodplain development permit from the county to make improvements in those areas.

Q. So if she has a FEMA map -- if she had had a FEMA map, that indicated that the property was not in a special -- what did you call it, special --

A. Flood hazard area.

Q. -- flood hazard area, that she wouldn't need the variance we've been talking about?

MR. HUGHES: Object to the form of the question.

Q. (BY MR. McKENDREE) Is that right?

A. It's not a variance. It -- and it wouldn't be a map. It would be a letter from FEMA stating that she's not in a special flood hazard area. And that is just as good as a map for individual property owners.

(Deposition Exhibit 18 was marked for identification.)

Q. Sir, can you identify Deposition