TRANSCRIPT OF PUBLIC HEARING OF
PROCEEDINGS OF THE BOARD OF COUNTY COMMISSIONERS,
BOULDER COUNTY, COLORADO, HELD ON MAY 7, 2002, AT 2:00 P.M.,
REGARDING DOCKET #SU-01-12, HALLMAN HOUSE KENNEL
SPECIAL USE REVIEW AND SITE SPECIFIC DEVELOPMENT PLAN
FOR A KENNEL WITH MORE THAN 12 DOGS OR CATS.
Location of Property: 12416 Flagg Drive, east of Lafayette
and south of Baseline Road, in Section 1, T1S, R69W

PRESENT:    Jana Mendez, Chair, Board of County Commissioners
            Paul Danish, County Commissioner
            Ronald K. Stewart, County Commissioner

STAFF:      Greg Oxenfeld, Land Use Department
            Pat Mayne, Assistant County Attorney
            Dave Webster, Water Resources Engineer, Transportation Department
            Barbara Andrews, Assistant County Attorney
            Susan Ashcraft, Deputy to Board of County Commissioners

For purposes of this transcript, all parties will be referred to by their last names. Text in brackets "[]" indicates transcriber's comment to add clarification, but is not part of the transcript.

MENDEZ:     – Two o'clock hearing, which is Docket Number SU-01-12, Hallman House Kennel special use. Greg . . . Commissioner Stewart is on his way; he'll be here in – oh, there he is. Okay.

OXENFELD:   [away from microphone – seems to be computer problems]

MENDEZ:     Oh-Oh – check the plug?

BYRNE (?):  I hope it's not infectious.

[Pause while staff gets equipment working.]

MENDEZ:     Okay, go ahead.

OXENFELD:   Greg Oxenfeld, with the Land Use Staff's recommendation for Docket SU-01-12, the Hallman House Kennel. This property is located at 12416 Flagg Drive. The applicants are Tynia Johnson and Patricia St. Tier, and the agent is Ed Byrne. This is a slide of the subject property, showing the approximate location of structures within the parcel. The Land Use Code requires that kennels with more than 12 dogs or cats be kept at a minimum of 300 feet from any property line or that other mitigating circumstances exist or may be created which has the same or better mitigating effect, as approved through special use review. The subject

CA 7263
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

8

regarding the buildings or anything else.

DANISH:    Okay. How many animals were there at the time?

MAYNE:    Of the alleged violation?

DANISH:    Yeah.

MAYNE:    Just more than seven, I mean, is what we basically alleged in the complaint, which was, then, against the zoning regulation.

DANISH:    So – it's just – if there were more than seven, it was without a permit – that was the central issue?

MAYNE:    My central goal was to get the kennel not operating until you all have given it an approval, or not.

DANISH:    Okay.

MAYNE:    Get her into the application process; that was my understanding, so we did not pursue the other zoning violations.

DANISH:    Okay.

MENDEZ:    Okay. Mr. Byrne. Could you take about 15 minutes, like staff did? Okay, 20.

BYRNE:    I'll do my very best. I don't know what the lamps gonna do. What I'll try to do is – I'm going to go ahead through the slide show and try to get as much of it done as I can. If we get stopped, I'll switch to some of the other things that I wanted to say.

MENDEZ:    And we have the photos here.

BYRNE:    Yes. This is the location in a topo map. You've seen some pictures of the area. This is an aerial view of the same vicinity. I'm sorry, for the record, this is Ed Byrne; I reside in Boulder. I represent Tynia Johnson, who is here. Her mother is her co-applicant, Patricia St. Cyr, they're co-owners of the property. And, I'm gonna just run through this flood stuff; I know it's a difficult question, but I think it's important to understand what analysis might provide for us in the way of better information out there. It is difficult for my client to find the resources to provide that data up front, but if it were to be the single condition that would stand between her and an approval, it could then be justified and it could be financed.

CA 7270
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

20

pier.

DANISH:    Full bridge with a center pier.

KOSTECKI:    Center column –

DANISH:    With about 35 feet on each side –

KOSTECKI:    – yes –

DANISH:    – that's clear, with an elevation of 18 feet over most of it.

KOSTECKI:    Okay. And, from what I can tell, an extensive model would probably show that she's out of the flood way. The modeling is very expensive, as I'm sure Mr. Webster can confirm; it's just a matter of we're not opposing life and safety issue here, we're just looking to put a small fence in the area. The velocities of that water flowing within the flood way were more or less two to two and a half cubic feet per second – er, feet per second. So, we're in the very low velocity backwaters of the stream when it backs up against the Highway 7 bridge. I don't know if you have any –

STEWART:    – no –

KOSTECKI:    If you would like, I can submit the calculations that were done for the bridge to show capacities. There's three scenarios that were done: One was just using the 1975 data; it provides cross sections of water elevations as they would be with the 1975 data going through that bridge. It provides plenty of elevation above the water surface until it even intersects the bridge and then above the bridge, it still has the thickness of the bridge to back up some more.

DANISH:    These were unobstructed flows, I'm assuming.

KOSTECKI:    Yes.

DANISH:    Okay.

KOSTECKI:    And that's why I said there's plenty of excess capacity if some obstructions did occur, it would have to be a lot of obstruction to start backing it up that much.

DANISH:    Where's the next bridge upstream?

KOSTECKI:    I am not sure.

CA 7282
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

26

issues then – now, David –

WEBSTER:    Sure. Dave Webster, Transportation Department, Water Resources Engineer. I had just made some notes during some of the presentations that were made, and it's only been in the last several weeks that I've taken a good hard look at what's happening with Coal Creek within this particular reach. It was two and a half weeks ago that the applicant had asked for two complete plates of the study mapped out with the flood way delineated. It's correct that the federal maps don't show the flood way delineation, however, it is up to the local administrator, which would be the County in this case, to have authority over flood way. In researching that, it's apparent that the technical addendum that contains the technical flood way calculations was dated like the year after the flood plain information report was submitted. So, in my opinion, I mean, – it could be that that information was presented after all the initial information concerning the flood plain was submitted to FEMA and they had made their formal certification of the flood plain mapping. In any case, that's just some background on the flood way. After the applicant's request to go ahead and delineate this, you had to do it by hand, and it's unfortunate that at the time we didn't have the engineer go ahead and do it on the mapping that they had provided with the 100 and 500-year flood plain shown. However, I went so far upstream to the point where, you know, how Flagg Drive kind of comes around from the west and it turns north. It's interesting to me that there is no actual split flow analysis that the engineer provided. So, that was interesting to me. They had just kind of, you know, plugged in the information, the input information, into the model and let it do its thing. Also, the model that they had chosen to use back then isn't the same model that we use nowadays. It's not the Heck modeling that we prefer to use or that's accepted and approved by FEMA, however, FEMA did approve whatever information they submitted back then. This flood way model was kind of a separate thing. You know, it was a separate analysis, using a different model in itself. In any case, what I'm getting at is I'm not sure that we can rely on this information as being completely accurate. To me, it's curious that there's a split flow condition, but they did not analyze it; they just really kept jumping from cross-section to cross-section and although the model probably took into consideration a cumulative effect of what's happening upstream and downstream, it's probably not very accurate between the two cross-sections where the applicant's property is located. And so, in that regard, I guess I wouldn't be surprised if maybe a re-analysis of this flood way information might come out showing that the flood way is actually pulled back and we have in fact two separate flood ways on either side of Flagg Drive and a much narrower width of each flood way on either side. It's possible. Right now, it's purely speculation and I would still refer, still require a flood way analysis to show that this is the case.

DANISH:    Do we know what size the culvert was that was replaced by that bridge?

CA 7288
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

27

WEBSTER:    You know, it doesn't say in the report and –

DANISH:    Pretty unlikely it was a 70-foot wide culvert, though . . .

WEBSTER:    Yeah. No, it – I don't – I think it was actually a bridge, not a culvert. What's interesting is the flood study does not show that it overtopped. It doesn't overtop; the 500-year storm overtops, but it has capacity for the 100-year storm, so whatever was there was substantial enough to pass the 100-year storm. And, I think what you're seeing on the mapping is probably a function of the high amount of flow – we're talking about 11,000 cfs, which is a fair amount of flow. And, the topography upstream, too. I mean, the channel is only so wide and deep and then when it comes out of its banks, it's really pretty flat topography as we've seen in the photographs and the other mapping, and also there's really like two split flow conditions that occur: One at Flagg Drive and one at the railroad embankment, so you will have a lot of water west of Flagg Drive. However, it's interesting when – to note that when you finally get north to Highway 7, or Baseline Road, that there is capacity there and it does not overtop; it goes through. It's just –

STEWART:    So, you would say that it's not what the former bridge was, because at Baseline Road the storm flow is going through.

WEBSTER:    It is on the 1976 mapping, correct.

STEWART:    Right. Okay.

WEBSTER:    And I'm not so sure that, you know, it's – I haven't checked the records. I haven't investigated when in fact – maybe the applicant's engineer could speak to this, but I haven't seen the records as far as when that bridge was replaced. It took place after the study. But, it is interesting to note that it did – they are showing that it does have the capacity. So, and I – like I said – it's a function of all those other things, the split flow condition, the flat topography, and so on. And then, I guess lastly, it's good to get more and more information. I think some of the information the applicant has submitted – I mean, it definitely doesn't hurt, however, it's not suitable based on what our flood plain regulations are requiring for flood way. I mean, as much as I'd like to believe that maybe the flood way is different within this particular reach and especially on this property, and as much as I think it – it probably is different, we to actually re – re-analyze this particular reach, using acceptable methods, including the Heck data. You know, taking all the old data, re-inserting and coming up with a duplicate model and re-running it and having a professional engineer do that for us. You know, this application is no different than any other that we've required this type of process for development in a flood way, or with infringes that would affect the flood way.

CA 7289
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

34

going to be operating a facility, but rather the compatibility of the proposed use to the neighborhood that exists there. We don't create special uses for individuals; it's really created for uses that will exist on a property and some of the folks here have suggested that they'd kind of like to see more flexibility in the regulations to allow perhaps more of this sort of thing. That's kind of a reasonable expectation on the part of people who might take their dogs to a kennel like this. It's a little different kind of when it's on the receiving end of that kind of issue, where you're living in a rural neighborhood; you've moved to the country because of the sort of peace and quiet that the country can often provide and you sometimes find that that isn't going to exist, given a use or a proposed use that may come into your neighborhood. And I think really that's the kind of balance we have to look at here in determining whether or not an approval would be given. To me, if there were an approval, I think we'd want to look seriously at the number of dogs that are permitted, or the number of animals that are permitted, whether or not it be kind of a seasonal sort of thing, Paul, as you were suggesting, or a holiday kind of thing as the applicant has suggested. Or, whether overall, that number of 60 is too large to begin with. I think, also, that to some extent that some sort of approval were given that there should be some standards established in conditions about the operation of the facility and about review that could be periodically given to look at that question of how has that use then settled into the neighborhood. Over the course of serving on the Board for a number of years, we've had a number of these issues before us, specifically about kennels, and they are, they're difficult issues; particularly, when you're out in the country where the background noise is lower than it is in a more urban environment. It's almost like the quiet that's there is more valued because it's more – it's clearer there than it is in the bustle of urban life. In my neighborhood, for instance, in town, I'm used to a lot more noise. People who are out walking on the paths around our house; the many animals that are in the neighborhood, the dogs and other, and just the chatter that goes on in the neighborhood. That's a very different situation than a rural kind of neighborhood where I do think one of the things that we're charged to do is to preserve that kind of rural way of life and this is a hard nut in that kind of situation, I think. So, I'd like personally to have a chance to look a little more at the flood plain issue and for Dave, for you, to give more consideration to that. I'd like to have the applicant consider some more reasonable limit in terms of the number of dogs that we might be talking about if in fact an approval were given, and I'd like Land Use Staff to consider the sorts of conditions that might be applied that would give the County, on a periodic basis, the chance to look at the operation of the facility and make a determination of whether or not that use, once given, is being administered in a way that allows the use to continue.

DANISH:    Yeah, I think that, you know – to me, you know, the two questions that really have to be addressed before we go anywhere are, what is the flood situation? And, you know, we're dealing with a flood way, not a flood plain. A flood way is written

CA 7296

Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

35

not just for the safety of the applicant, it's written for the safety of the people downstream, because as damage occurs and debris are added to the burden of the flood, they create real life safety issues for those who live below the flood. And, it's – you know – it's for good reason that we object to development in the flood way. But, the fence that comes loose in the flood and if it adds to the sort of debris that back up and dam the bridge, then what comes downstream when that breaks. It's not just a question of overtopping' sometimes those bridges wash out and you get a wall of water that goes downstream and that can kill people. Beyond that, just the more debris that goes in; if you have a flood flowing at 30 miles an hour and you have a board in there, that's like – if you're unlucky enough to be in the way, that's like getting hit by a car at 30 miles an hour. So, I mean, there are real safety issues here; this isn't a hypothetical. And, I think we do have to determine whether there has been a significant change there. That there's at least some evidence that there is. Beyond that, there is the question of the general impact that comes from the kennel and the noise that goes with it and what the effect on the neighbors are. You know, I am impressed by the argument that you're not granted perfect quiet when you move into an area, but there is a certain expectation that also comes when people move to rural areas that they're not getting the same noise that you get in the city. And, I don't think it's any mystery that when we deal with the other great noise issue in Boulder County, which is airplane noise, that almost invariably all the complaints are coming from the rural areas; the mountains, and not from the cities. The same aircraft which are driving people nuts in the mountains go over my house in Boulder very often and I barely notice them because the background noise is higher. And that is just a reality of acoustics. So I – you know, that's a balancing question and I do think we need to give some thought to it. And, you know, I could see first that there is some sort of a baseline limit on the number of animals and second, there may be – it might be reasonable to say at certain times of the year that can be increased somewhat. Just my gut feeling is that 60 animals is probably excessive in terms of the kind of noise that would create on the rest of the neighborhood.

MENDEZ:    Well, I'm having some of the same kinds of thought about this and I really don't think it's in our purview, even, to go to do anything without more flood information. I really – I don't see how we can, and yet I also am mindful that the noise issue really does need to be addressed. We have four nearby neighbors who sent letters and I think we have to take that into consideration and think a lot about what kind of numbers would be – or could be appropriate for this, and especially dogs, because that's where the noise issue comes from.

STEWART:    I have a question for Barb. Barbara, is this the only provision in the Code that allows for kennels? Or do we have two provisions for kennels.

ANDREWS:    This is the only provision that allows for kennels. You amended it in 2000, about

CA 7297
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

39

[side conversation between Mendez and Stewart]

STEWART: – No, that was for the work that was being done – the work that was being done in the creek corridor –

MENDEZ: – oh, that's right –

STEWART: – and the wetlands that were being created, I think.

MENDEZ: That's right. That's right, and then the place itself –

WEBSTER: I may – that information may be in the referral that was submitted to our office, and so I can definitely look – look that up and follow up.

DANISH: But their project is within their city limits?

STEWART: Right.

WEBSTER: Right.

STEWART: Well, all of this kind of affects how much time we're gonna be asking for. Maybe we could schedule this for a month from now and then if it's not finished at that time, proceed from there.

MENDEZ: Would that work for you?

[unidentified]: I didn't hear what he said –

MENDEZ: To come back in about a month to hear – to look at some of these issues that have been raised. 'Cause we really can't – there's really no way to approve this with the regulations that say flood plain development is disallowed, so we need to get more information before we can even make a decision. It's just – you know – unless the flood plain, er way, is in a different place than we now – information says it is, there's really no way we can act on it.

[applicant?] Well, there's a couple of things that I want to say before I respond to that particular question, if that's okay.

MENDEZ: Did I close the public hearing?

STEWART: I don't think so.

MENDEZ: I think I did, but I guess I can re-open it.

CA 7301
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

47

me to day, "hey, I'm potentially in the flood plain." If you're in the flood plain, or not, that doesn't matter if there is a permit required for a fence, then that would be caught. How many fence permits have been ever put out, ever?

MENDEZ:      This is a whole different thing when you're in a special use —

JOHNSON:    — okay, fine.

MENDEZ:      -- occasion – situation, and I, you know, I'm sorry, but I think we can muddle through – get through this and look at some different configuration of the fence if you don't want – and I understand the expense involved in doing a flood way study, but maybe we can look at that other option in the meantime and then you can come back in a couple weeks or three weeks, or something, and —

JOHNSON:    I can meet with Dave tonight, if possible; tomorrow morning, and I could be back here, you know, next week, or whatever. But, you know, in the meantime I have no way to feed my child, I have no way to pay my mortgage. I was accused, in the beginning of this process, because supposedly I was dragging my feet, because I didn't understand how this went while I was trying to collect data to get it here and now that it's here, the feet-dragging seems to be on somebody else's foot, so I'd like to see this move along swiftly. You know, how many dogs can I have? Can I have 10; can I have 20? Who makes that decision?

MENDEZ:      Well, that – we're going to ask staff to look at that, given the size of the property, the location of the property, and come up with some recommendations.

JOHNSON:    Okay, so in the meantime, could I get approved for the seven to 11 dog kennel with a hundred-foot setback?

ANDREWS:   That has not been applied for.

MENDEZ:      No. You can't – we don't just decide to switch an application, you know, on the moment —

STEWART:     I think we should try, however, by next Tuesday to have this ready to go.

DANISH:      I think we should.

MENDEZ:      Under the current application?

STEWART:     Okay. That's May 14th, at [aside] – do we have some time, Susan?

ANDREWS:   We have the above-grade amendments scheduled for 10:00 on May 14th.

**CA 7309**

Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB