# TRANSCRIPT OF REHEARING OF
## PROCEEDINGS OF THE BOARD OF COUNTY COMMISSIONERS, BOULDER COUNTY, COLORADO, HELD ON MAY 14, 2002, REGARDING DOCKET #SU-01-12, HALLMAN HOUSE KENNEL SPECIAL USE REVIEW AND SITE SPECIFIC DEVELOPMENT PLAN FOR A KENNEL WITH MORE THAN 12 DOGS OR CATS.

### Location of Property: 12416 Flagg Drive, East of Lafayette and south of Baseline Road, in Section 1, T1S, R69W

**PRESENT:**  Jana Mendez, Chair, Board of County Commissioners
Paul Danish, County Commissioner
Ronald K. Stewart, County Commissioner

**STAFF:**  Greg Oxenfeld, Land Use Department
Pat Mayne, Assistant County Attorney
Dave Webster, Water Resources Engineer, Transportation Department
Barbara Andrews, Assistant County Attorney

**SPEAKERS:** Ed Byrne, Attorney for Applicants

**For purposes of this transcript, all parties will be referred to by their last names.**

MENDEZ:  We're gonna get started; we have some little ones coming from Lafayette at 10:30, and so we don't want to keep them waiting. We are here for a rehearing and recommendations on conditions on Hallman House Kennel special use, and first, I don't know who is going to go first; if you've already spoken, or – I'll have – should we go through the staff conditions first? Or, would you like to make a proposal? Because, we had asked Tynia to come up with some proposed limits on the number, and . . .

BYRNE:  I can address that for you. I would appreciate it.

MENDEZ:  Okay .

BYRNE:  I had, I am Ed Byrne, who is here for Tynia, who is in New Mexico today with family. I thought the engineers were going to be talking to staff and working up numbers, but I discovered yesterday afternoon that they had not, but I did speak to Tynia about the conditions proposed, particularly the numbers, and my concern is that she be enabled to succeed, I guess, and that we focus these conditions carefully to deal with the potential impacts, which seem driven primarily by noise-related issues. I think it should be noted that Tri-County Airport is right there and that Baseline is also right there. I have maps that I've distributed that show the location of those who have objected. On Tharp, is the one immediately to the west; he and Tynia have had a bit of a boundary dispute. I think there is more there than meets the eye.

**CA 7250**
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

2

STEWART: Madame Chair, I thought what we were going to be doing was to be looking really at the potential conditions that might be imposed, the -- and not sort of going over the ground that we went over last time.

BYRNE: – well, I wasn't going to spend a lot of time, I just wanted to –

DANISH: Yeah –

MENDEZ: Yeah. Let's just talk about the number of dogs. . . .

BYRNE: . . . Just trying to set a context . . .

MENDEZ: Well, we talked about it, though. We had talked about those issues. And now what we're trying to do is see what's outside the flood plain as we define it; where the fences can be, how many animals, and those kinds of things. . .

BYRNE: Spoken with FEMA. They will entertain a FOMA application, which is a map – not a map amendment, but a clarification. . .

DANISH: . . . clarification . . . It makes it – it allows them to specify where that flood way is; I could not get that done in the short amount of time we had. .We need to do some additional surveying to make sure we've got the right elevations located on the property and get it to them and hopefully get a turn-around time in short order. As far as trip levels -- I'm sorry – the number of animals. We'll accept – I think staff's approach of peak, semi-peak and off-peak is appropriate, but the issue has always been related to the dogs and the barking of the dogs. And, the trip analysis in the traffic study suggest that this is a very low impact – and the actual language is that, "very low amount of traffic that is easily served by the adjacent road network." So, we don't want numbers that were created based on past experience at the site to limit her ability to have some success beyond what she's done in the past and we would urge that the number be 60 outdoor animals for peak, 45 outdoor animals for semi-peak and 30 outdoor animals for off-peak. So the numbers that -- a little more than county staff specifically recommended, but very close, and, you know, there are 10 acres of land here. I mean, if we accepted staff's numbers, it would be one dog per acre. And, the neighbors who have written letters – wrote those letters six months to a year ago and she's tried to mend those fences and seems to have done so, particularly with respect to Mr. Vigil, who did come to the Planning Commission hearing. So I would ask you . . .

STEWART: Are all the exotics indoors?

BYRNE: I believe they are. But I left room for a llama or some animal that might be out--

CA 7251
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

3

MENDEZ:    . . . or an ostrich . . .

BYRNE:    – or some animal that might be outside that doesn't bark, but would count towards an outdoor animal limitation. And, I guess the other thing I should mention in terms of the conditions proposed – there's a little bit of concern on what our sound testing methodology would be. I don't know, once the fences get put in, how we test for certain how those noises relate. The expert indicated that he felt the fence does that regardless of the number of animals; it does as well as 300-foot, but I guess we'd be interested in knowing more, because this could be one of those triggers that would shut her down. She has permits in process for the buildings. Her one concern about moving the mobile home – the one that was added and is in submitted for building permit is outside of the setback area and the other had been there for years before, and she would like some time to move that one. She asked me to ask for 12 months. The landscape . . .

MENDEZ:    Before she would then open? Because it has to be done before – that's one of the condition --

BYRNE:    Well, that's one of the questions. I understand that's how the conditions are set up.

MENDEZ:    Because it is in the flood plain, right? Er, flood way?

BYRNE:    No, it's not. Actually, those aren't in the flood way. Just a setback issue. –

MENDEZ:    Just doesn't meet setback – I see.

BYRNE:    It would remain even after – if she were to leave

MENDEZ:    Just move a little bit to meet setback?

BYRNE:    I think she'd have to move it 15 or 20 feet; I'm not entirely certain of that. But, it costs money and she's going to have to spend a lot of money to come into compliance here, and that's a concern I have on the landscape side of things. I don't know what an expert would tell us about planting shrubs along this fence at this point in time.

DANISH:    . . . water there anyway, and it gets to a point where you're going to –

BYRNE:    – yeah –

DANISH:    – have to be using paper dishes because of the cleanup problem, it strikes me that a landscape –

CA 7252
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

4

MENDEZ: Well, that's not a water issue, that's a sewer issue, it seems to me.

BYRNE: And that's an indoor – I think she can find a way to water with enough water. But, that's what I'm concerned about right now. It's a difficult time to plant. I don't know that she has the ability to get a letter of credit. She's not your typical applicant, or – and, we can certainly try, but I think the time frame is appropriate; we can find a time when the planting should take place. She's not unwilling to do that. I'm not sure what "some trees and shrubs" means, but we can come up with a plan. I would assume the corners are very important and along the streetscape, more so than others, but we can talk to staff about that. She doesn't want to have to remove any building, but I don't think that that's required by any of these conditions. I was looking at Condition 8. On Condition 9, there's mention that no public or employee access should be allowed to any structure on the property without adequate sanitation facilities, and it just seems that goes one step too far. We wouldn't say farm workers couldn't go in a barn just because it doesn't have toilet facilities. Right now, she's not sure she can have employees because of the handicapped access issue, but she hopes for her own purposes to deal with that in her main residence and to say that, for example, the building in back that she has the kennel in, where the cages are for the dogs, they couldn't go in there because it doesn't have a toilet, doesn't seem to be necessary. Or, appropriate here.

MENDEZ: I don't think cages are structures, are they?

BYRNE: Well, it's in a building –

MENDEZ: – Oh, I see –

BYRNE: -- It is in a structure, but it's not a structure that has plumbing. We'd be willing to draft a development agreement, but we'd sure appreciate a draft electronic version to start from – I'd hate to have to do it from scratch, but we'll do it if we have to. And, I guess her last concern was with respect to Condition 12 – you know – I don't know of another instance where a review hearing was required, but I think we can come back and see how we're doing. The language in the last sentence, "any violation shall be sufficient grounds for revocation" is concerning only because if it's an inadvertent violation and it isn't repeated after notice has been given that there's a concern, I'd hate to see her lose her – the investment she's about to make without there being an opportunity for it to be heard.

MENDEZ: Well, it just says "sufficient grounds," it doesn't say immediate automatic revocation.

BYRNE: Right. I just – you know – we could end up in front of a county court judge and I

CA 7253
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

5

don't know that that ought to be the first step. We ought to be able to get together and work things out. She's obviously very concerned, because for a number of years she's thought she was in compliance; she learned she wasn't; she struggled to try find a new setup that would work; thought she had found one. I tell her that just because you're paranoid, don't think they're not watching you and I think she's coming to understand that that's going to be part of her future. It does frustrate her and I just want to make sure that we're fair in dealing with anything that might come up in the future. She's being asked to spend tens of thousands of dollars and right now – you know, she's not a serial kennel operator. Or, maybe she is, but that's not a felony. She's very concerned that at every step staff has been very tough on her and she's hoping that she can mend those bridges and get back to normalcy. Thank you for hearing us out.

MENDEZ:    Now staff, would you go over the recommendations that you have? Greg. . .

OXENFELD:    The numbers that staff came up with are basically the numbers that were represented in the application materials. The applicant was requesting a maximum of 60 animals and they did break it down in their application that included dogs, cats and exotics, and so that's how staff came up with a maximum of 60 animals on site. Staff also believes that –

STEWART:    Did they actually have these actual numbers, 35, 15 and 10?

OXENFELD:    They did not. They had, when they were originally proposing the application, they had a hundred animals, and they had broken that down to 60 dogs, 20 cats, and 20 exotics. So, staff just kind of used a general percentage based on that to come up with these numbers.

MENDEZ:    But you're saying that maximum would only be during the holiday weekend times.

OXENFELD:    Correct.

MENDEZ:    And that's pretty much what was portrayed that those are the times you hit those limits.

OXENFELD:    The applicant also requested spring break period, which is typically the last two weeks in March, so the staff did include that, as well. It's noted in the trip generation analysis provided by the applicants, there is a statement that indicated there would be zero to 10 dogs on the site at any one time; this is on average, and so that's how staff got down to the lower number that's presented. I think a lot of the conditions are typical-type conditions required for outdoor lighting, landscaping, and building permits. I'm working with Ed to try and get the

CA 7254

Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

6

response from the U.S. Fish and Wildlife Service regarding the Prebble's Meadow Jumping Mice, so we do have a contact person there and I'll to help them coordinate efforts to get a response.

MENDEZ:    So, instead of asking her to do it, we could help expedite that.

OXENFELD: We can help.

MENDEZ:    Okay.

OXENFELD: – get that done. The – with regards to Condition No. 9, with regards to public or employee access, that was – staff's understanding is the commitment of the applicant in order to meet the County Health Department Regulations. I did refer these recommendations to the County Health Department and they seemed satisfied with the wording. And, if there are any other specific questions I can answer with regard to these conditions, I'll be glad to.

MENDEZ:    What about that – the issue of, you know, no public access to any of the buildings although, – because it's considered a commercial building rather than a farm building? Or – I mean, this is in an agricultural area, but this is a commercial operation. Is that why these?

OXENFELD: There are a couple of issues there: There is one with the County Health Department and also one with the County Building Division –

MENDEZ:    – right –

OXENFELD: – with regards to the Uniform Building Code, making sure there is adequate access, for safety – health and safety reasons, so that's the basis for that condition. We'll be glad to entertain any other information that the applicant can provide with regards to working with those two agencies to see if that condition could be modified.

MENDEZ:    Okay. And, you know –

STEWART:   What could we just say – "and to restrict public or employee access to such buildings as determined by the County Health Department," which kind of leaves it open to them to – if it's a health requirement, it's not really even something that is a County requirement; it's a state law sort of requirement and whatever's done is gonna have to be in accordance with that. So, –

MENDEZ:    – right –

CA 7255

Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

7

STEWART:    – but it doesn't set up front exactly what that means, it just says that the County Health Department needs to do it in accordance with approved health policies.

ANDREWS:    And would you want to include the Building Division in that, as well?

OXENFELD:    Or the Uniform Building Code?

ANDREWS:    Correct.

STEWART:    – requirements –

MENDEZ:    Yeah, but nothing beyond the UBC, but at least those have to be met.

OXENFELD:    Correct.

MENDEZ:    Well, you know, and the conversation about this being one dog per acre – there's not going to be an awful lot of fencing if we don't do it in the flood plain. I mean, it's not gonna be many acres, I would think, or even – what would you say it would be, Dave?

WEBSTER:    I haven't looked at the specific area, however, and actually one point of clarification what Mr. Byrne was discussing with the uh – I believe he was mentioning the concept of a letter of map amendment through FEMA in which they would look at a site survey and they may have the option to do the fencing in accordance with what they previously submitted. But, to answer your first question, I'm not certain of what the area would be within the flood plain limits that we've established.

MENDEZ:    So, for the time being, it's a lot smaller than 10 acres and maybe it could go up to five, or something, but we don't know that yet. And, if it's outside –

DANISH:    So what our approval would be, then, is that it would be conditioned upon one of these three options being met –

MENDEZ:    Mmhm; that's my understanding –

WEBSTER:    Yes, and I believe that Condition Number 3 in the packet would probably encompass those three separate options, as far as flood way matter goes.

MENDEZ:    Could we, then, if the fencing is outside the flood way, it wouldn't have to be the break-away fencing; this would just be a standard cedar noise-mitigating fencing, is that correct? I doesn't say --

CA 7256
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

8

WEBSTER: Well, that partly depends on FEMA's determination for a letter of map amendment. They will decide –

MENDEZ: – oh, they may require it –

WEBSTER: – they may very well decide, based on the site survey, that the majority of the property is in fact outside of the special flood hazard area, which includes all 100-year flood plain. If they do not and they are more specific, and the fencing is proposed to be in areas outside the flood way inside the flood fringe, we may still want to entertain fencing that is –

MENDEZ: – okay –

WEBSTER: – break-away.

MENDEZ: So, that's why it isn't specific.

WEBSTER: Correct, I think a lot of it depends on the option that the applicant chooses and the outcome associated with that.

MENDEZ: Okay, Pat . . .

MAYNE: It's just as your staff that's in charge for you of the zoning enforcement aspect of this matter, if you could be very specific about the timing of the various conditions and when Ms. Johnson would be able to open and what conditions would be able to be left undone for her to open, would be very helpful for the legal action.

MENDEZ: –Give your name –

MAYNE: Oh, my name's Pat Mayne, from the County Attorney's Office.

MENDEZ: Thank you. Well I think this is pretty specific that it wouldn't be opened until – I wouldn't mind, you know, waiting on the landscaping – I don't think that's one thing before the building, or the special use was approved, but I think the mobile home needs, you know, needs to meet – you know – this is – to get – to come into compliance with our codes is, to me, a – and –

STEWART: Oh, and I'd be willing to do that, as well, in terms of the landscaping. In saying that, however, I'd say that we never do that for anyone else. So, to the extent that we are doing it, it's being done in this case, but in no others. So, having said that, I'm willing to do it, but I just – we generally say that all of this in place before something happens.

CA 7257
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

9

MENDEZ:       And we don't usually have kennels in agricultural areas, either, so –

DANISH:       Well, I agree, I think it should be in place because the zoning enforcement is very, very difficult, and there have been difficulties with this particular project and that facility on Arapahoe. The truth is that we received dozens of complaints about that. The noise issue is that a dog makes a particular kind of noise, not just an issue of decibels, but also the quality of the sound that in a lot of ways is like airplane noise. You hear it against the background where it stands out, it's a much more intrusive kind of thing than the roar of traffic.

MENDEZ:       Right.

DANISH:       And, under those circumstances, I'd like to see – plus the flood issue, which is not trivial, even though the only reason that they're not – that this isn't a flat rejection is that County staff has erred in the past on it. No question about that. And, that was a certain fence which I think this a conditioned approval, but the condition must be fulfilled and completely met before you move forward.

MENDEZ:       Well, 35 dogs is a lot of dogs in a neighborhood, and – but I'm just hoping that the fencing is gonna be mitigating and that she is a "dog whisperer," and can make the dogs whisper [chuckles] –

DANISH:       [unaudible]

MENDEZ:       – well, it's – and that's why I think it is totally appropriate to have that review in a year, because I think this is taking a chance, and –

DANISH:       – I agree –

MENDEZ:       – the 35 dogs – I wish we could have a demonstration of 35 dogs in one spot, but I don't think we can –

DANISH (?):   – not here –

MENDEZ:       No.

BYRNE:        I will say that she had 50 to 60 during the Christmas period this year and I'm not aware of any complaints, so I actually think she's able –

MENDEZ:       Okay, okay –

BYRNE:        – to manage it pretty well. She does use barking dog collars.

CA 7258
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

10

MENDEZ:     Oh.  Alright, well, what is the pleasure of the Board?

STEWART:    I'd be willing to do something a little more in terms of the number of animals on –
maybe all other days to up to 15 dogs, 5 cats, 5 exotics.  And, I think maybe we
should have a little discussion whether cats enclosed are really – whether there
needs to be a limitation there –

MENDEZ:     – right –

STEWART:    – or odd – exotics enclosed, whether there needs to be a limitation there.  There
are, I'm sure, some sort of humane society kind of standards, given the – you
know – the size of –

MENDEZ:     – the square footage –

STEWART:    – the facilities they're going to be in, but –

MENDEZ:     Yeah, I wouldn't really reduce the number of cats on any of those days.  If 15 will
fit on a special days, I don't see a reason for not allowing the 15 on the other days.
They just don't have the same kind of impact on the neighborhood, but I don't –

STEWART:    So, maybe 15 cats throughout?

MENDEZ:     Yeah, I don't think that's a problem.

STEWART:    And maybe the 10 exotics throughout, as long as they're inside?

MENDEZ:     Mmhm –

STEWART:    – and if they're outside, they count --

MENDEZ:     – they count for the outside --

STEWART:    – against the dog number?

MENDEZ:     Yeah.  Although an ostrich doesn't make as much of noise --

DANISH:     – I'm willing – I'm going to – well, we don't know that, actually.  [laughter] I
mean, the problem is the term "exotics."  A slippery term.

MENDEZ:     Are you talking about snakes?

DANISH:     Well, if you're talking about snakes, they don't talk very much.  You may be

CA 7259
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

talking about another animal that brays and if an exotic, for instance, is a jackass or a rooster or something of that nature, that can get pretty loud.

MENDEZ:    Yeah, but it is the countryside.

DANISH:    It is the countryside, but you have a whole bunch of concentrated animals and we sat here listening to three hours the other day to a hearing on what happens when you bunch up animals together, and you sometimes – sometimes you get totally unexpected problems, like chronic wasting disease. And, this is a noise issue, but what it says to me is I would like to see this work with the numbers that we have in place here. I'm willing to make a distinction on cats, because they're indoors, but in terms of the outside animals, I think that the increasing of the numbers ought to be something that is re-visited at the time of the review. I don't that should be done now –

MENDEZ:    Oh, no, I wouldn't increase the dog –

DANISH:    – and I have real doubts about even increasing the number of dogs under any circumstance.

MENDEZ:    I think we go –

STEWART:    – for me, the approval of this is really a stretch, because I think in the rural environment, kind of having a quasi-business next door, or a business next door, isn't really what most people think about when they think about moving to the country. And this is the country. And the only thing that's compelling to me about it is the neighborhood see – along there, seems to be pretty accepting of it. So, I'm willing to go with the neighborhood in this case that's fairly accepting, notwithstanding my skepticism about this kind of use in a rural setting. If I lived out in the country, about the last thing that I'd want to have next to me would be 35 dogs on the Christmas weekend, and so I – for me, to approve it is kind of a stretch. I'm willing to make the stretch, but I'm also – feel strongly that the conditions here need to be complied with and that, to the extent that this neighborhood finds that the kennel isn't being run in the manner that is – we have every – we've had all kinds of assurance from the operator is going to be the case, and I don't think it should be there. And I think it's fair to say that this operator has been the subject of continual sort of complaint by other neighborhoods where operations have existed and, as well, in this neighborhood, where we have letters from neighbors complaining and as well have heard from people over the years; not just the letters we have, but have heard from people over the years to the ex – to such an extent that we've had zoning enforcement actions going on this for a very long time. So, to me, we're taking a big step in saying this can exist there, but I think if it's going to exist there, it needs to do it in compliance with these conditions. The landscaping ones maybe could be required within six months, or

CA 7260
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

12

something like that. And, I really don't know that, you know, Mr. Byrne's statement that we're – she's being asked to spend ten thousand dollars; I don't know that any – or thousands of dollars – I don't know that anyone's asking her to spend thousands of dollars. She wants to run a business there, and in order to run a business, you have to spend a certain amount of money in order to run the business, so – did you move it, Paul?

DANISH:    Yeah, I'm moving it with conditions as written, with the exception of 15 cats.

STEWART:    And I'll second it.

MENDEZ:    And then, is anybody amending it to within six months?

STEWART:    The six months landscaping?

MENDEZ:    Landscaping? I would do that.

STEWART:    Would you?

DANISH:    Yes.

BYRNE:    May I ask? As written and revised during the course of our conversation?

DANISH:    No, as written here with the exception of the amendments that we just stated. In other words, the numbers are 35 dogs, 15 cats and exotics during the peak periods; they are 15 dogs, 15 cats, 5 exotics during the weekends, and 10 dogs, 15 cats, 5 exotics during all other times.

MENDEZ:    But we had earlier discussed amending the conditions to the as required by state law via the health department and building code.

STEWART:    Right, that Health Department condition I think should just leave it to the Health Department and the UBC to decide what is required in terms of who can go in and out of the building.

MENDEZ:    Yeah; okay – so that's a friendly amendment. Okay.

DANISH:    Okay.

MENDEZ:    That's a second, then?

STEWART:    It is.

CA 7261
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB

13

MENDEZ:　　All those in favor?

DANISH, STEWART, MENDEZ:
　　　　　Aye.

MENDEZ:　　We'll see how it goes.

BYRNE:　　Thank you.

[End of this item.]

CA 7262
Johnson/Saint Cyr v. BOCC, et al.
Case No. 04-cv-0245-RPM-BNB